[Civ. No. 20044. Second Dist., Div. Three. Sept. 10, 1954.]

FENDORA BADY, Respondent, v. DR. HOWARD F. DETWILER et al., Defendants; CITY OF LOS ANGELES, Appellant.

DEWEY LEWIS et al., Respondents, v. FRANK PERKINS et al., Defendants; CITY OF LOS ANGELES, Appellant.

MARGARET DETWILER et al., Respondents, v. CITY OF LOS ANGELES, Appellant.

Roger Arnebergh, City Attorney, Bourke Jones, Assistant City Attorney, Joseph N. Owen, Deputy City Attorney, and Weldon L. Weber, Deputy City Attorney, for Appellant.

Erb, French & Picone, Samuel B. Picone, Hagenbaugh & Murphy, Van A. Hagenbaugh and Robert E. Benton for Respondents.

VALLÉE, J.—The city of Los Angeles appeals from three consolidated judgments against it entered on eight jury verdicts in favor of the several plaintiffs in actions for damages for personal injuries. Liability was imposed on the city under the Public Liability Act of 1923, now sections 53050 and 53051 of the Government Code, sometimes referred to as the "act." A motion for a new trial was denied.

On Sunday morning, August 5, 1951, at about 7:30 a. m., a collision between an automobile driven by Frank Perkins and one driven by Margaret Detwiler occurred at the intersection of Jefferson Boulevard and Flower Street in Los Angeles. Traffic control devices of the "Acme" type, owned, maintained, and operated by the city, were located at each of the four corners of the intersection, having lights and semaphore arms operating on independent electrical circuits from a master control box at the southwest corner of the intersection.

Perkins, with four passengers, was driving an automobile east on Jefferson. When about 150 feet from the intersection he observed that the semaphore arm on the signal on the southwest corner, controlling eastbound Jefferson

traffic, indicated "Go." When about 20 feet from the intersection he observed that the semaphore arm on the signal on the northeast corner, controlling westbound Jefferson traffic, also indicated "Go." He did not observe any signal lights, only the semaphore arms. He continued into the intersection.

Mrs. Detwiler, with four passengers, was driving an automobile north on Flower Street. As she approached the intersection she saw that the semaphore arm on the signal on the southeast corner, controlling northbound Flower traffic, indicated "Go." She did not observe the signal on the northwest corner, controlling southbound Flower traffic. She continued into the intersection.

The two cars collided in the intersection. The signals were not cycling, changing from "Go" to "Stop" or vice versa. They were stuck on "Go" for Jefferson traffic, on "Go" for northbound Flower traffic, and on "Stop" for southbound Flower traffic. It is agreed that the condition of the traffic control devices was defective and dangerous.

The city's first contention is that the liability imposed by Public Liability Act of 1923 does not extend to the defective and dangerous condition of traffic control devices.

Section 53050 of the Government Code provides: "As used in this article: . . . (b) 'Public property' means public street, highway, building, park, grounds, works, or property. (c) 'Local agency' means city, county, or school district." Section 53051 reads: "A local agency is liable for injuries to persons and property resulting from the dangerous or defective condition of public property if the legislative body, board, or person authorized to remedy the condition: (a) Had knowledge or notice of the defective or dangerous condition. (b) For a reasonable time after acquiring knowledge or receiving notice, failed to remedy the condition or to take action reasonably necessary to protect the public against the condition."

The city argues that traffic control devices are not included in the term "property" as used in the statute.

█ Generally, the word "property" is used as referring to a thing of which there may be ownership. Civil Code, section 654 says: "[T]he thing of which there may be ownership is called property." █ The word is a generic one. When unqualified it is sufficiently comprehensive to include every species of estate, both real and personal, whether choate or inchoate. (*Ponsonby* v. *Sacramento Suburban Fruit Lands Co.*, 210 Cal. 229, 232 [291 P. 167]; *Crouch* v. *Crouch*,

28 Cal.2d 243, 261-262 [169 P.2d 897]; *Hunt* v. *Authier*, 28 Cal.2d 288, 295-296 [169 P.2d 913, 171 A.L.R. 1379]; *Estate of Glassford*, 114 Cal.App.2d 181, 189-190 [249 P.2d 908, 34 A.L.R.2d 1259]; *People* v. *Settles*, 29 Cal.App.2d Supp. 781, 786 [78 P.2d 274]; *Finley* v. *Winkler*, 99 Cal.App.2d Supp. 887, 890 [222 P.2d 345].)

The question in *Coleman* v. *City of Oakland*, 110 Cal.App. 715 [295 P. 59], was whether the word "property," as used in the Public Liability Act of 1923, included a city-owned-and-operated motor truck. In holding it did, the court said (p. 718): "It is respondent's contention that the general word 'property,' following as it does the words 'public streets, highways, buildings, grounds, works', must take its color from them, and can only apply to other classes of real property not therein specifically enumerated, under the doctrine *ejusdem generis*. . . . In this case the section above quoted contains within itself a strong indication that the word 'property' was not intended to have a restricted meaning. We have intentionally italicized the word 'property' in the places in which it occurs in section 2, Statutes of 1923, page 675. In the first instance its meaning is not restricted. It imposes a liability 'for injuries to persons and property.' Clearly the liability is for injuries to property of any character, real or personal. Separated from the first place of its occurrence by only fifteen words it is used again. In its second use we are asked to hold that it has an entirely different and more limited meaning. To do so would require some stronger reason than a rule of construction which is merely an aid in ascertaining the legislative intent. It seems unlikely that the Legislature would have used the same word in such close juxtaposition with such widely different meanings. 'It is a well-established rule of construction that when a word or phrase has been given a particular scope or meaning in one part or portion of a law it shall be given the same scope or meaning in other parts or portions of the law, and particularly in the same section thereof.' (*Ransome-Crummey Co.* v. *Woodhams*, 29 Cal.App. 359, 360 [156 P. 62].) We are satisfied that the word 'property' in this section is broad enough to cover the case of a motor-truck in a dangerous or defective condition. (*Cf. Huff* v. *Compton City Grammar School Dist.*, 92 Cal.App. 44 [267 P. 918]; *Dawson* v. *Tulare Union High School*, 98 Cal.App. 138 [276 P. 424].)"

In *Smith* v. *County of San Mateo*, 62 Cal.App.2d 122 [144 P.2d 33], the court stated (p. 129): "The title and body of

our statute [Public Liability Act of 1923] clearly show that the liability imposed thereby was intended to be quite broad in its scope. It imposes liability upon counties for injuries 'resulting from the dangerous or defective condition' of certain public places including parks and play grounds 'in all cases' where the officers or employees 'having authority to remedy such condition, had knowledge or notice of the dangerous or defective condition' and had failed to remedy the condition within a reasonable time after acquiring such knowledge or notice. There is no indication in the statute that it was intended to be limited in the same manner as was the liability of a private landowner at common law and there is every indication to the contrary. The liability imposed is predicated solely upon (1) the existence of a dangerous or defective condition (2) the knowledge, actual or constructive, of the existence of such condition and (3) the failure to remedy such condition within a reasonable time after acquiring such knowledge. While the statute does not evidence an intention on the part of the Legislature to make public corporations liable for all injuries resulting from natural conditions upon the public domain, it seems entirely clear that the Legislature intended to impose liability upon a public corporation which might maintain for an unreasonable time a known dangerous but remedial condition in a park or playground regardless of whether such dangerous condition was attributable to natural or artificial causes.''

Liability has been imposed upon a local agency under the act for maintaining or permitting the maintenance of the following kinds of property in a defective or dangerous condition: an incinerator in which trash was burned on school grounds (*Huff* v. *Compton City Grammar School Dist.*, 92 Cal.App. 44 [267 P. 918]); an upright piano in a schoolroom (*Dawson* v. *Tulare Union High School*, 98 Cal.App. 138 [276 P. 424]); a piling or telephone pole washed back and forth by the ocean waves (*Benton* v. *City of Santa Monica*, 106 Cal.App. 339 [289 P. 203]); the shore of a lake in a public park and playground (*Magnuson* v. *City of Stockton*, 116 Cal.App. 532 [3 P.2d 30]); a dumping ground from which a fire escaped (*Pittam* v. *City of Riverside*, 128 Cal.App. 57 [16 P.2d 768]); a defective, old, abandoned sewer system below the surface of a street (*Durante* v. *City of Oakland*, 19 Cal.App.2d 543 [65 P.2d 1326]); a white line placed along center of a street to designate to motorists the center of the street which led directly into the center of a concrete abut-

ment (*Sandstoe* v. *Atchison, T. & S. F. Ry. Co.,* 28 Cal.App. 2d 215 [82 P.2d 216]) ; 10-inch cast-iron pipe in 18-foot lengths placed and left along the curb of a street (*Barsoom* v. *City of Reedley,* 38 Cal.App.2d 413 [101 P.2d 743]) ; a playground, permitting boys to play hard baseball in close proximity to a sandbox in which small children played (*Bauman* v. *San Francisco,* 42 Cal.App.2d 144 [108 P.2d 989]) ; a street intersection in the shape of an "L," failing to maintain warning signs (*Silva* v. *County of Fresno,* 63 Cal.App.2d 253 [146 P.2d 520]) ; a picnic shelter which fell (*Perry* v. *City of San Diego,* 80 Cal.App.2d 166 [181 P.2d 98]) ; a boulevard stop sign which had been down for a week (*Rose* v. *County of Orange,* 94 Cal.App.2d 688 [211 P.2d 45]) ; a large pool of water making the sidewalk area and half of the street impractical for pedestrian use (*Jones* v. *City of South San Francisco,* 96 Cal.App.2d 427 [216 P.2d 25]) ; a rubbish disposal dump (*Osborn* v. *City of Whittier,* 103 Cal.App.2d 609 [230 P.2d 132]) ; a storm drain under a highway (*Parcher* v. *City of Los Angeles,* 106 Cal.App.2d 421 [235 P.2d 220]) ; zoological gardens (*McKinney* v. *City & County of San Francisco,* 109 Cal.App.2d 844 [241 P.2d 1060]) ; a water pool on a public beach (*Wexler* v. *City of Los Angeles,* 110 Cal.App.2d 740 [243 P.2d 868]) ; a boulevard stop sign (*Ervin* v. *City of Los Angeles,* 117 Cal.App.2d 303 [256 P.2d 25]) ; a fence around a public golf course (*Plaza* v. *City of San Mateo,* 123 Cal.App.2d 103 [266 P.2d 523]).

In *Arellano* v. *City of Burbank,* 13 Cal.2d 248 [89 P.2d 113], the city was held liable under the act for permitting a highway to end so that one driving along the street drove across an intersection onto the unpaved right of way of a railway company. There was no curb, sidewalk, parkway, or other barrier to warn a driver of the changed condition of the highway. In *Ackers* v. *City of Los Angeles,* 40 Cal. App.2d 50 [104 P.2d 399], the city contended that it was not liable for the defective condition of its sidewalks because sidewalks are not specifically mentioned in the statute. The court considered the contention to be wholly without merit.

Section 1953 of the Government Code governs the liability of certain public officers "for any damage or injury to any person or property resulting from the defective or dangerous condition of any public property." The statute is similar to the Public Liability Act. In *Hinton* v. *State of California,* 124 Cal.App.2d 622 [269 P.2d 154], the plaintiff was crossing the street as a pedestrian where normally the green light

lasted only 10 seconds. The time required to cross the street was about 22 seconds. There was a push button signal device erected on a pole for the use and protection of pedestrians in crossing a street. When the push button was pressed a green signal came on, and a pedestrian had 24 seconds to cross the street. A sign had been on the signal stating "To cross the street push button and wait for green light." This sign was gone and had been missing for a week. It was held that the push button signal device was public property within the meaning of the statute.

*Stang* v. *City of Mill Valley,* 38 Cal.2d 486 [240 P.2d 980], relied on by the city, is not analogous. In Stang the action was for damages sustained as a result of a fire on the plaintiffs' property. The case was decided on a demurrer to the complaint. The water lines leading to the fire hydrant adjacent to the plaintiffs' property, and the fire hydrant, had become clogged and were incapable of providing sufficient water for effective fire control. The court held that a municipal corporation was not responsible for the destruction of property within its limits by a fire which it did not set; that prior to enactment of the Public Liability Act one could not recover damages from a private water company for a property loss by fire due to the company's failure to maintain its water system properly; and that the act was not "intended to impose a greater liability on the city than would prevail against an individual or a private corporation charged with negligence in the administration of its fire protection." In the opinion it is said that "the act sustains the imposition of liability in the situaton where the city is *using* the dangerous or defective property and injury was proximately caused thereby." In the present case the city installed, maintained, operated, owned, and used the traffic control devices. *Campbell* v. *City of Santa Monica,* 51 Cal.App.2d 626 [125 P.2d 561], also relied on by the city, is not in point. In that case the plaintiff was injured when struck by a private automobile while walking on a promenade which was a wide sidewalk. The driver of the car was violating the law in driving on the sidewalk. There was no duty on the city to control the use of the sidewalk so as to avoid accidents on it. The sidewalk was neither defective nor dangerous. The injury was caused, not by the condition of the sidewalk, but by the negligent operation of the automobile.

The city refers us to a number of cases from other jurisdic-

tions.[1] They are not at all helpful. No one of them considered a statute in any respect similar to sections 53050 and 53051 of the Government Code. They hold that in installing and maintaining a traffic signal a city is acting in a governmental capacity, and apply the familiar rule that in the absence of a statute authorizing suit a municipality acting in a governmental capacity is not liable for the torts of its officers or agents.

We find no reason to believe that the Legislature did not intend to use the word "property" in the Public Liability Act, in its broad and comprehensive sense. There is nothing to qualify the word either in the act or in the decisions applying it. Traffic signals are not excepted. To hold they were would be to torture the plain wording of the statute. Liability is not limited to the physical condition of streets, or to faulty pavement, or to obstructions on the surface of the street, or to the traveled parts of streets, as the city appears to argue. Nor is it limited to property not used in the exercise of a police function. We conclude therefore that traffic control devices owned, maintained, and operated by a city are "property" within the meaning of the act.

The city next contends the implied findings of the jury that it had knowledge or notice of the defective and dangerous condition and that for a reasonable time after acquiring knowledge or receiving notice it failed to remedy the condition or to take action reasonably necessary to protect the public against the condition, are unsupported by the evidence.

A master control box for all four signals was located in the standard supporting the signal on the southwest corner of the intersection. There was a motor in the head of each of the four signals called a "head motor" which controlled the semaphore arm on its corner. There was a timer and a drum in the master control box. The four head motors were controlled by the timer in the master control box. The drum

---

[1]*Martin* v. *City of Canton*, 41 Ohio App. 420 [180 N.E. 78]; *Dorminey* v. *Montgomery*, 232 Ala. 47 [166 So. 689]; *Avey* v. *West Palm Beach*, 152 Fla. 717 [12 So.2d 881]; *Sandmann* v. *Sheehan*, 279 Ky. 614 [131 S.W.2d 484]; *Edwards* v. *City of Shreveport*, (La. App.) 66 So.2d 373; *Auslander* v. *St. Louis*, 332 Mo. 145 [56 S.W.2d 778]; *Hodges* v. *City of Charlotte*, 214 N.C. 737 [200 S.E. 889]; *Vickers* v. *Camden*, 122 N.J.L. 14 [3 A.2d 613]; *Parsons* v. *New York*, 248 App.Div. 825 [289 N.Y.S. 198], affd. 273 N.Y. 547 [7 N.E.2d 685]; *Cleveland* v. *Lancaster*, 239 App.Div. 263 [267 N.Y.S. 673], affd. 264 N.Y. 568 [191 N.E. 568]; *Parson* v. *Texas City*, (Tex.Civ.App.) 259 S.W.2d 333; *Burchett* v. *City of Stanton*, (Tex.Civ.App.) 262 S.W.2d 952; *Presley* v. *City of Odessa*, (Tex.Civ.App.) 263 S.W.2d 293; *Holton* v. *City of Bartow*, (Fla.) 68 So.2d 385.

rotates, and trolley fingers touch it and supply electrical energy to the motors in the signal heads. A defect in the master control box might affect all four semaphore arms.

The city maintains a traffic engineering department charged with the duty of keeping traffic signal devices in repair. This department maintains a division of signal repair having traffic signal repair units which operate in trucks and are informed of a "bad order signal" at a given intersection. When a "bad order signal" comes through a communicating system of the police department to the repairmen of the traffic engineering department in charge of the traffic signal units, they are not told the nature of the defect or difficulty; they are merely told that there is trouble at a particular intersection. The man in the field, on receiving a call, logs the time of the call and proceeds to the intersection directed. On arrival it is his duty to make a reasonable inspection to determine the nature of the defect and take all corrective measures indicated. If it appears the nature of the defect is such that he cannot rectify it, it is his duty to turn the signal off and report the matter to the traffic engineering department. The traffic engineering department keeps a report of all calls received from all sources and of all calls relayed to the field on a daily trouble report. It is completed by a "trouble dispatcher." On the reports there is an item designated "trouble" which is filled in only after the fieldman reports in person or by telephone the defect he found. The fieldman records on a "daily work report" the time he receives a call, the time of arrival at the intersection, the work done, and the time he left. The head of the traffic engineering department testified that his employees have the duty and are instructed to make a thorough and complete check and inspection of the signals when they arrive at intersections in response to a call, even though they are apparently in good working order.

Between July 26, 1951, and the time of the accident on August 5, a period of 10 days, there were six reports of trouble with respect to the signals at the intersection in question— July 26; July 31; August 1; August 3, two calls, 8:02 a. m. and 10:40 p. m.; August 5, day of accident, 5:07 a. m. On July 26 there were crossed wires in the timer, all arms were slow, four timer fingers were replaced, and the crossed wires separated. Dessaro, an employee of the traffic engineering department, received "a bad call" on July 31. He arrived at the intersection at 5:02 and left at 5:05. He repaired a

light on the southwest corner. On August 1 the semaphore arms were not changing. An employee of the traffic engineering department found that the trouble was in the timer contact drum. On August 3, two days before the accident, at 8:02 a. m., Stinebaugh, an employee of the traffic engineering department, responded to a call at the intersection. The semaphore arms were not changing properly; a timer finger was in bad order. Stinebaugh reported to his superiors, in writing, that the drum in the master control box on the southwest corner should be removed and cleaned or replaced and that the timer wires therein needed insulation. The work Stinebaugh recommended was not done until August 8, two days after the accident, by Bowman, also an employee of the traffic engineering department. On a second call on the same day, August 3, at 10:40 p. m., all four semaphore arms were "half up" and a repairman found a timer finger to be in bad order.

Dessaro, who was on duty at the time, received a "bad order signal" call at 5:15 a. m. on the day of the accident by way of radio from the police department, with respect to the intersection in question. He was at the intersection a total of 3 minutes, including the time required to make an entry concerning the call. The entry reads: "Time received call, 5:15; arrived, 5:30, Jeffer— and Flower—new stop lite out, 1=15 watt lamp, time o.k., left 5:33." Dessaro testified he stopped and parked his truck before looking at the signals; he sat in his vehicle and looked at the signals through a complete cycle for one minute. During the two-minute period, the time left after observing the signals, he parked the truck, got a stepladder out of the truck, got a light bulb out of the truck, walked over to the northeast corner, set up the ladder and climbed it, unscrewed two screws that take the lid off, removed a bulb, put a new bulb in place, secured the lid by two screws, took the stepladder down, walked back to the truck, put the ladder in the truck, threw the old bulb back in the truck, and wrote his report. Dessaro testified the arms were working properly at 5:30 a. m. He had no independent recollection of having been at the intersection prior to August 5, although the records showed he had been there on July 31. There was evidence that the signal arms were turned off from midnight until somewhere around 6 o'clock in the morning, during which period only the lights were turned on. The city says 5:30 a. m. is somewhere around 6 o'clock in the morning. Dessaro also testified he did not go to the master signal control box on the southwest corner.

At about 8:40 a. m. on August 5, the day of the accident, Stinebaugh went to the intersection on a "bad order" call. He observed that the signal arms at the southeast, southwest, and northeast corners indicated "Go," and the arm at the northwest corner indicated "Stop." He made repairs which took about 20 minutes and stayed another 20 minutes watching the signals. Stinebaugh testified it is the duty of a repairman to determine the difficulty. He determined that the motor controlling the signal arm at the southeast corner had an "open winding" which was not an unusual finding. To find the "open winding" required merely breaking the motor with the fingers when it made a couple of cycle changes. Bowman, a traffic signal electrician for the department of traffic engineering, went to the intersection on August 8, three days after the accident, with the written recommendations of Stinebaugh. He went to the master signal control box on the southwest corner. He found that the timer was worn and that the wear was more than three days old. The wiring leading into the timer had a hard crust on it which was more than three days old. The segments, drum, and dragging gear of the bearing of the timer were worn. A segment is like a camshaft: it rotates and makes and breaks with the fingers. The dragging gear which was worn meshes with the top of the gear on the segment drum and turns it. The fingers ride the camshaft. Electric current goes from the segment through the fingers which control the motor which in turn controls the "Stop" and "Go" semaphore arms.

A witness who was employed at a service station on the southwest corner of the intersection where the accident occurred testified that from 5:50 a. m. of the day of the accident until it occurred the signals were in the same condition—"Go" at the southeast, northeast, and southwest corners, and "Stop" at the northwest corner; that for six to eight days prior to the accident the signals were not working properly and he had made two calls to the city hall with reference thereto; that when he made the calls the condition of the signals was the same as on the day of the accident. There was other evidence that the condition was the same between 5:50 a. m. and sometime after the accident.

Actual notice of a defective or dangerous condition is not required. Constructive notice is enough. Constructive notice is defined by section 19 of the Civil Code as that knowledge of circumstances "sufficient to put a prudent man upon inquiry as to a particular fact" where "by prosecuting such

inquiry, he might have learned such fact." The rules governing constructive notice require reasonable diligence in making inspections for the discovery of unsafe or defective conditions. (*Fackrell* v. *City of San Diego,* 26 Cal.2d 196, 206 [157 P.2d 625, 158 A.L.R. 773]; *Peters* v. *City & County of San Francisco,* 41 Cal.2d 419, 427 [260 P.2d 55].)

 The law is settled that at least after notice of a defective or dangerous condition a public agency is under a duty to make a reasonable inspection and is chargeable with constructive notice of what such an inspection would have disclosed. (*Newman* v. *County of San Mateo,* 121 Cal.App.2d 825, 832 [264 P.2d 594].)

In *Christy* v. *City of Alhambra,* 9 Cal.App.2d 499 [50 P.2d 454], the plaintiff stepped into a sunken water meter box in the parkway between the curb and the sidewalk, which box and meter were maintained and controlled by the city. The water meters were read each month. The court said (p. 501): "Under Statutes of 1923, page 675, a municipality is chargeable with actionable negligence if it has notice of the dangerous or defective condition of public works and fails within a reasonable time thereafter to remedy the same, so as to protect the public against injury. It was the duty of the city to keep its meter boxes in repair, which duty entailed an obligation to inspect them at reasonable intervals. If the meter readers were not charged with the duty of inspection it is to be presumed that some other employee was and that the city did not allow the boxes to go uninspected for a period of a year. 'Implied or constructive notice arises from facts from which it may be reasonably inferred or from proof of circumstances from which it appears that the defect ought to have been known or remedied, the rule prevailing in such cases requiring the exercise of ordinary or reasonable care to discover the defect.' (43 C.J. 1045.) This rule is given recognition in *Wurzburger* v. *Nellis,* 165 Cal. 48 [130 P. 1052], *Dawson* v. *Tulare Union High School,* 98 Cal.App. 138 [276 P. 424], and *Roberts* v. *Pacific Gas & Electric Co.,* 102 Cal.App. 422 [283 P. 353]. We take the question to be, in each case, whether, by the use of reasonable diligence, the given condition should have been discovered within a given period of time, and the answer must depend upon the facts of the particular case."

The facts here are similar to those in *Silva* v. *County of Fresno,* 63 Cal.App.2d 253 [146 P.2d 520]. They are concisely stated in the opinion (p. 259): "Plaintiffs' evidence estab-

lished that a certain sign or marker with a road reflector indicating that the road turned or ended, had been placed at the south end of Fairfax Avenue by defendant county; that on the night of plaintiffs' accident it was down and lying in the grass about 12 feet from the place where it originally was erected; that it had been knocked down on previous occasions and occasionally replaced. One witness testified that on the particular night involved he noticed the post to which the marker was attached 'had been laying there for some time'; that he could tell 'by the color of the grass underneath, not getting the sunshine.' Another witness testified that he had seen the sign up and down three times before 'he went over it'; that on one occasion he replaced the sign himself. The supervisor of the district testified that he was 'intimately familiar' with this and each intersection of the 1,029 miles of road in his district; that he had a road foreman in the district here involved who had 'charge of the maintenance of signs' and devices for the purpose of indicating turns and ends of roads and that he should be 'cognizant of things that were needed'; that the signs were placed there as 'a warning sign of danger' and it was one of the foreman's duties to see that 'these signs were properly maintained.' '' The court held that the implied finding of the jury that the condition complained of had existed for sufficient time to give the county constructive notice was supported by substantial evidence.

Whether a defective and dangerous condition existed for a sufficient length of time to constitute constructive notice, and also whether a reasonable time to remedy the condition or to take action reasonably necessary to protect the public against the condition existed are questions for the trier of fact to determine. (*Rowland* v. *City of Pomona,* 82 Cal. App.2d 622, 626 [186 P.2d 447]. See also *Perry* v. *City of San Diego,* 80 Cal.App.2d 166, 170 [181 P.2d 98]; *Wise* v. *City of Los Angeles,* 9 Cal.App.2d 364, 366 [49 P.2d 1122, 50 P.2d 1079]; *Cressey* v. *City of Los Angeles,* 10 Cal.App. 2d 745 [53 P.2d 172].)

The jury could reasonably infer that persons authorized to remedy the defective condition of the signals should have known of such condition at least as early as August 3 when Stinebaugh reported to his superiors that the drum and timer in the master control box were defective and should be repaired. The testimony of Dessaro that the semaphore arms were working properly at 5:30 a. m. on the day of the

accident does not, as a matter of law, negative this conclusion. The jury may well have concluded from the facts we have related that Dessaro's testimony was not worthy of belief, and also that if he had followed instructions and had made a reasonable inspection of the signals (he was there two hours before the accident) the defective condition would have been remedied prior to the time of the accident, or action taken to protect the public. Further, the evidence warrants an inference that failure of the signals to function was caused by trouble in the timing mechanism in the master control box; that the traffic engineering department should have known that fact on July 26, 11 days before the accident when the semaphore arms were not working properly, and that 11 days was a reasonable time within which to remedy the condition.

The evidence fully supports the implied findings of the jury that the city had notice of the defective condition of the traffic control devices and of the dangerous character of such condition, and that it failed for a reasonable time after receiving such notice to remedy the condition or to take action reasonably necessary to protect the public against the condition. It may be said further that it may be inferred reasonably from the evidence that the city had actual notice of the defective and dangerous condition and failed within a reasonable time to remedy the condition. Since the conclusion of the jury has the support of substantial evidence we cannot disturb it here.

Finally, the city says the defective and dangerous condition of the signals was not a proximate cause of the collision; that the sole proximate cause was the negligence of the drivers of the two automobiles, and that each of them was contributively negligent. The argument on the question of proximate cause is that "to drive blindly through an intersection, without looking to the right or left, in absolute and unjustifiable reliance upon the continued perfect operation of such mechanical device is extremely negligent conduct and constitutes the sole proximate cause of the ensuing collision." The mere statement of the argument demonstrates its fallaciousness.

Want of proximate cause does not exist as a matter of law unless the only reasonable hypothesis is that such want exists; reasonable or sensible men could have drawn that conclusion and none other. Where there are differences that may be drawn, one for and one against, the one against will be followed. Before it can be held, as a matter of law,

that want of proximate cause exists, the evidence must point unerringly to that conclusion. (*Smith* v. *Schwartz,* 14 Cal. App.2d 160, 164 [57 P.2d 1386]; *Traylen* v. *Citraro,* 112 Cal. App. 172, 175 [297 P. 649]; *Rovegno* v. *San Jose K. of C. Hall Assn.,* 108 Cal.App. 591, 595, 596 [291 P. 848].) ▮ It is sufficient if a defendant's negligence be a proximate cause of the injury. (*Sawdey* v. *Producers' Milk Co.,* 107 Cal.App. 467, 480 [290 P. 684]; *Goehring* v. *Rogers,* 67 Cal.App. 253, 259 [227 P. 687], opinion of Supreme Court on denial of hearing.) ▮ Liability may be imposed on a defendant where its negligence is one of several contributing factors, each of which is a proximate cause of the injury. (*Westover* v. *City of Los Angeles,* 20 Cal.2d 635, 639 [128 P.2d 350].) ▮ In *Bosqui* v. *City of San Bernardino,* 2 Cal.2d 747 [43 P.2d 547], it is said (p. 764): "The defendant City suggests that the Public Liability Act does not apply where the defective condition of the street or highway concurs with some other efficient cause or act of a third person to cause the injury. It is urged that a strict construction of the statute leads to this conclusion. The question is apparently new in this state. A few decisions from other jurisdictions support this view. (See *Grenier* v. *Town of Glastonbury,* 118 Conn. 477 [173 A. 160].) Other courts hold the city liable in such a case. (See *Beebe* v. *Scotts Bluff County,* 92 Neb. 501 [138 N.W. 737]; *David, Municipal Liability in Tort in California,* 7 So.Cal.Law Rev. 372, 440.) In our opinion, where the thing exists which is denounced by the statute, namely, the neglect to remedy a dangerous or defective condition after knowledge thereof, and it proximately causes the injury, the City is liable under the clear meaning of the law despite the existence of another and concurring cause." (See also *Bauman* v. *San Francisco,* 42 Cal.App.2d 144, 154 [108 P.2d 989]; *Jones* v. *City of South San Francisco,* 96 Cal.App.2d 427, 435-437 [216 P.2d 25]; *Osborn* v. *City of Whittier,* 103 Cal. App.2d 609, 615 [230 P.2d 132]; *Jones* v. *City of Los Angeles,* 104 Cal.App.2d 212, 216 [231 P.2d 167]; *Plaza* v. *City of San Mateo,* 123 Cal.App.2d 103, 108 [266 P.2d 523]; *Hinton* v. *State of California,* 124 Cal.App.2d 622, 629 [269 P.2d 154].)

It cannot be said as a matter of law, that the defective and dangerous condition of the traffic control devices was not a proximate cause of the collision.

On the question of contributory negligence, which is asserted against the two drivers only, the argument is that each

driver should have seen the other as he neared the intersection; that Perkins, driving' east on Jefferson, at no time looked to his right or left to see if any cars were approaching on Flower Street and did not prior to the accident see the Detwiler car; that Mrs. Detwiler, driving north on Flower, was watching the street ahead, kept looking ahead all of the time, observed the "Go" signal on the southeast corner, did not observe the signals on the northwest, northeast, or southwest corners, did not see a car to her right which had stopped at the intersection, and did not see the Perkins car until "just an instant" before the collision; and that two other persons in cars safely negotiated the intersection under the conditions existing at the time of the collision. ▮ A reasonable prudent person approaching an intersection with a "Go" signal naturally assumes that traffic approaching on the intersecting street will stop. Neither driver had any notice of the defective and dangerous condition of the signals. Each driver observed a semaphore arm which said "Go." Manifestly, the fact that some other person safely negotiated the intersection is not evidence that either Perkins or Mrs. Detwiler did not exercise ordinary care. Whether a person exercising ordinary care should have seen the car which was stopped to Mrs. Detwiler's right at the intersection was a question for the trier of fact. ▮ The law did not impose the duty on either Perkins or Mrs. Detwiler to anticipate negligence on the part of the other. The lookout required of each of them was such as a reasonable person would maintain. (*Freeman* v. *Churchill*, 30 Cal.2d 453, 459 [183 P.2d 4].) ▮ Each had a right to assume that the other would perform his duty under the law, and had a right to rely and act on that assumption unless it was reasonably apparent to one of them, or in the exercise of ordinary care would be apparent to him, that the other was not going to perform his duty. (*Connor* v. *Pacific Greyhound Lines*, 104 Cal.App.2d 746, 753 [232 P.2d 500].)

In *Taylor* v. *Sims*, 72 Cal.App.2d 60 [164 P.2d 17], it is said (p. 63): "Since the intersection here involved was controlled by an electric traffic signal plaintiff was not required to look into the cross streets before entering the intersection. The signal permitted him to move in an easterly and westerly direction. The rule being that where the intersection movement of traffic is governed by signaling devices the determination of the question as to whether the one driver or the other is responsible for a collision at the intersection depends pri-

marily upon the showing as to whether one vehicle or the other was being operated in conformity with the signal. The driver proceeding pursuant to the 'Go' signal is not to be deemed negligent because he fails to maintain a lookout for a vehicle which might enter the intersection in violation of the signal." In *Connor* v. *Pacific Greyhound Lines,* 104 Cal. App.2d 746 [232 P.2d 500], the giving of the following instruction was approved (p. 753): "The driver of a vehicle who enters an intersection pursuant to a green 'Go' signal and is exercising due care is not required to maintain a lookout for a vehicle which might enter the intersection from · another highway in violation of the traffic signal."

 It is only where no fact is left in doubt, and no deduction or inference other than negligence can be drawn by the jury from the evidence, that the court can say, as a matter of law, that contributory negligence is established.
 Even where the facts are undisputed, if reasonable minds might draw different conclusions upon the question of negligence the question is one of fact for the jury. (*Arellano* v. *City of Burbank,* 13 Cal.2d 248, 257 [89 P.2d 113]; *Castro* v. *Sutter Creek U.H.S. Dist.,* 25 Cal.App.2d 372, 379 [77 P.2d 509].)

 In the circumstances disclosed, the question of contributory negligence was one of fact to be decided by the jury. As the verdict of the jury impliedly found Perkins and Mrs. Detwiler free from contributory negligence, we cannot disturb that finding. (*Barsoom* v. *City of Reedley,* 38 Cal.App.2d 413, 419 [101 P.2d 743].)

Affirmed.

Shinn, P. J., and Wood (Parker), J., concurred.

A petition for a rehearing was denied October 4, 1954, and appellant's petition for a hearing by the Supreme Court was denied October 27, 1954.