[Civ. No. 22980.   Second Dist., Div. One.   Aug. 11, 1958.]

ERNEST FOURAKER, Respondent, v. HILL AND MORTON, INC. (a Corporation), Appellant.

Schell, Delamer & Loring and Lee A. Solomon for Appellant.

Francis J. Gabel, Homer L. Martin and Bruce A. Randall for Respondent.

FOURT, J.—This is an appeal from a judgment in favor of the respondent for personal injuries sustained when certain lumber fell upon him.

In the complaint it was alleged that on August 10, 1953, the defendant negligently loaded, stacked and placed certain lumber owned by Hill and Morton, Inc., on a railroad flat car and caused the same to be shipped to Anawalt Lumber and Material Company, at Pacoima, California. It was also alleged that the defendant negligently loaded and placed the lumber upon the flat car without placing any cross stays or support (known as "stickers" in the lumber business) throughout the load to prevent the lumber from falling off when the stakes on the sides of the car were removed. The complaint further set forth that the plaintiff was an employee of Anawalt Lumber and Material Company, and that he was

directed by his employer to unload the flat car, and that when the car was being unloaded the lumber fell off upon him and he was seriously injured thereby.

On August 18, 1953, Fouraker was at work in his employer's lumber yard in Pacoima, doing yard work in connection with loading and unloading lumber, at which time the accident occurred. The lumber came into the yard in flat cars and box cars. The lumber with which we are concerned consisted of 6 inch by 6 inch unfinished, rough, new and wet timbers from 12 feet to 20 feet in length, which were on a flat car. It was the practice to unload unfinished lumber with a fork lift (a mechanical loader and unloader), and on the morning in question Fouraker was to strip the flat car with the heavy timbers on it. Stripping the car consisted, generally, in clipping the wire bands and taking the stakes out from the side of the car so that the fork lift could remove the lumber. Separators are placed in the load (sometimes called bolsters) at the time of loading to permit the mechanical discharge by a fork lift. Stickers are intended to tie the load together so that it can be handled without falling apart. In this instance Fouraker loosened the stakes by going on top of the load, knocked off some bracing material and then cut the steel bands which went across the top of the load. When he did this the posts at the side of the load swung free from the sides of the timber, which is an indication to lumbermen that a car is soundly loaded. Fouraker then climbed down off of the load and proceeded to take the posts out of the casters and placed them upon the ground.

The substance of the testimony of the witnesses most favorable to the respondent is as follows: Contreras, a fellow employee, stated that he was in the yard the day of the accident and saw the respondent lying on the ground with timbers on top of him; that he, Contreras, looked the flat car over and saw that there were separators in the load but no stickers, however, he later testified that he did see one sticker at the bottom unit of the timbers. Further, he said that he unloaded the car with a fork lift and found one small sticker at the unit. He said that he believed that six timbers had fallen from the top unit.

Fouraker testified, in effect, that the lumber on the flat car was in units four feet high and four feet wide, or eight timbers high and eight timbers wide (64 timbers in each unit). He had glanced at the load and it appeared to be straight up and down and it looked to him the same as all other loads had

looked. He stated that after the bands were cut, the stakes on the sides of the car swung away free and that no lumber was pressing against the stakes. He looked at the load when he got ready to remove the last stake and did not see any stickers.

Raymond Schuler testified that he examined the flat car after the accident and found the top rows of timbers on the outside of the car, and perhaps one or two other rows of the timbers had rolled off of the car. He also stated in substance that the lifts of lumber on the car were separated by separators to the end that room would be available for the mechanical discharge of the lumber with a fork lift. Further, he described a sticker as a thin piece of board about $3/4$ of an inch thick, and said that it was put into units of lumber to bind them together so that the lumber as piled would not separate and fall apart. He stated that lumber on a car is loaded 8 feet high, and that rough lumber needs more securing than smooth lumber, both for shipping and for unloading. He had examined the load on the flat car in question and stated that there were no stickers in the lumber.

Nick Cardil qualified as an expert witness and he testified that a load of 6 inches by 6 inches timbers requires stickers to stabilize it, and that a load of such timbers four feet high should have been stuck twice in each unit, and further, that if no stickers were used it would have been an extremely unstable load and very dangerous to be around. He also stated that if the stakes swung free when the wedges were loosened and the bands were cut, there would be an assumption upon the part of lumbermen that the car was soundly loaded. Further he stated that in rough lumber loads the sticker was very important to stabilize the load and tie it together. As to the use of a fork lift, he said in effect that timbers could be loaded with a fork lift even though the load was not stuck. He further stated in substance that a person standing upon the ground might not always be able to tell whether a load of timbers upon a flat car was properly stuck by merely looking up at the load, and that he had only heard of four accidents similar to the one in question within the last 10 years.

Appellant called as a witness David Johnson, who stated that he worked for the Brookings Plywood Corporation in Oregon (the original mill producer of the timbers) and that he had stacked some 6 inches by 6 inches green, rough timbers destined for appellant's place of business in Arcata, California,

upon trucks and trailers; that such timbers were stacked on the plane seven timbers wide and seven timbers high; that there would be four timbers, then a sticker, then three timbers on top of that. He stated that he had cut down the size of the units to seven timbers for the convenience of the trucking company; that there were broken units on each of the trucks, however, that he did not see the trucks unloaded. He did say, in effect, that he had removed the stickers in the upper courses of the units in breaking the units, and that he left those stickers on the load; that the stickers were left intact in the lower courses.

Bert Gilbert, an appellant's witness, stated that he was employed by appellant as a loading supervisor, but could not state that he was on the premises when the particular flat car in question was loaded. He testified that the units would come from the mill properly stuck, and that an entire unit is put onto a flat car just as it comes from the mill; that they loaded the flat car in whatever shape they received the load from the mill, and did not rearrange or touch any of the units and did not put stickers in any of the units. Further, he said that if the lumber left their yard not stuck, it would have been dangerous. He also said: "The minute you picked it up you'd be jeopardizing everybody's lives and limbs because it would fall over. I wouldn't say that it would do that, but you'd be risking your employees' lives or anybody else that happened to be walking in the neighborhood." At the trial he said the units were seven timbers across and seven timbers high, or each unit 3½ feet by 3½ feet; however, in his deposition he stated that the units were 4 feet by 4 feet, and were not broken down individually, and were lifted onto the flat car accordingly.

Nicholas Kempf, an appellant's witness, stated that he was a car inspector for the Southern Pacific Railroad, and had occasion to inspect the load in question, and that if the load was 8 feet high there should have been two stickers; however, that their inspection was for the purpose of seeing that the load would go to its destination in proper loading form, and that otherwise they had no interest in the matter.

Appellant contends that there were stickers in the load, and that (1) there was no negligence proved against appellant, there were no hidden dangers and the condition of the lumber was open and obvious; (2) the title to the lumber had passed from appellant to respondent's employer, and it was no longer under appellant's control, custody or possession; (3) the

respondent was guilty of contributory negligence as a matter of law.

We are of the belief that under the facts of this case the shipper who loaded the flat car is liable in damages to the employee of the unloading consignee for injuries proximately resulting from the negligence of the shipper in loading the flat car. In *Owen* v. *Rheem Mfg. Co.*, 83 Cal.App. 2d 42, at pages 46-48 [187 P.2d 785], it was stated:

''In upholding a verdict for plaintiff, this principle was announced in *Wintersteen* v. *National Cooperage & Woodenware Co.*, 361 Ill. 95 [197 N.E. 578] : that 'every person owes a duty to all persons to exercise ordinary care to guard against any injury which may naturally flow as a reasonably probable and foreseeable consequence of his act,' for which wrong the law furnishes a redress; that this duty to exercise ordinary care to avoid injury to another does not depend upon contract, privity of interest, or the proximity of relationship between the parties. There, as here, an employee of the consignee brought suit against the shipper. As the employee was opening a boxcar door, one of the barrels fell out and injured him. The shipper had used defective lumber for *shoring* or 'the dunnaging of the car.' In respect to negligence, the court there said:

'' 'If a reasonably prudent person might, and ordinarily would, foresee that the omission to do a certain act or the commission of an act in a certain way would likely result in injury to another, and injury to another does follow as a result thereof, such act of omission or commission is negligence, and the proximate cause of the injury. (1 Thompson on Negligence, § 50.) There was positive evidence of the defective condition of one of the strips used in the dunnaging of the car. . . . The facts and weight of the evidence were for the jury, and we would not be warranted in disturbing the verdict of the jury unless it be against the manifest weight of the evidence.'

''While our search has not disclosed a case where the courts of this state have applied the above-mentioned rule where, by the act of a shipper, injury resulted to a consignee or his employee, the *principle* has been employed in *Dahms* v. *General Elevator Co., supra* [214 Cal. 733 (7 P.2d 1013)], where the elevator operator in a business building was injured by the negligence of the defendant which had entered into a contract with the owner of the building (plaintiff's employer) to in-

spect and repair the elevator. It was there said, at page 738:

" 'We are of the opinion that it falls properly within another well-settled exception. There are numerous cases from nearly every jurisdiction which hold that an action sounding in negligence may be maintained by a stranger to a contract for the execution of a specific piece of work or the sale of a manufactured article, if the product of the stipulated work or the article sold was abnormally dangerous or noxious.'

"See also *Kalash* v. *Los Angeles Ladder Co.*, 1 Cal.2d 229 [34 P.2d 481], in which case it is remarked that things classified as inherently dangerous have been steadily extended to include those articles which are reasonably certain to place life and limb in peril, when negligently made, prepared or constructed, as it then becomes a thing of danger, with a corresponding extension of the application of the remedy. It began with articles such as the sale of poison and such things now include a dangerous and defective scaffolding (*Devlin* v. *Smith*, 89 N.Y. 470 [42 Am.Rep. 311] ; defective rungs in ladders, and defective spokes in automobiles (*MacPherson* v. *Buick Motor Co.*, 217 N.Y. 382 [11 N.E. 1050, Ann.Cas. 1916C 440, L.R.A. 1916F 696] ; etc. See also *Hall* v. *Barber Door Co.*, 218 Cal. 412 [23 P.2d 279] ; and *Johnston* v. *Long*, 56 Cal.App.2d 834 [133 P.2d 409]."

Without again reviewing the evidence, suffice it to say that there was testimony to the effect that there were no stickers in the upper part of the load of timbers, and that to load lumber in such a fashion was dangerous to the lives of persons who might come into the vicinity of the load.

In other jurisdictions there are well reasoned cases holding that a seller and shipper of goods by common carrier, who himself undertakes to load the shipment is under a duty to exercise reasonable care to do so in a manner reasonably safe for unloading, and that a violation of such duty will render the seller liable for injury to consignee's employee proximately caused thereby. (See *Pacific States Lumber Co.* v. *Bargar*, 10 F.2d 335; *Edwards* v. *Southern Railway Co.*, 233 Ala. 65 [169 So. 715, 106 A.L.R. 1133] ; *Yandell* v. *National Fireproofing Corp.*, 239 N.C. 1 [79 S.E.2d 223].)

There was no evidence that the load shifted en route, nor was there any evidence that the load had been disturbed before respondent began the routine stripping of the car prior to unloading.

Considering appellant's contention that the respondent was guilty of contributory negligence. From what has

heretofore been set forth, it is apparent that respondent did take at least some caution for his own safety, and in our opinion this was a matter for the jury to determine. The respondent saw that the stakes swung free from the load after the bands were cut, he glanced at the load and started to work on it, and he could see, as he walked up to it, that it appeared to be sitting straight up and down, and looked the same as other loads looked. We cannot say, as a matter of law, that under the circumstances respondent was guilty of contributory negligence. ■ The rule is set forth in *Anthony* v. *Hobbie*, 25 Cal.2d 814, at page 818 [155 P.2d 826]:

"The burden of proving contributory negligence is upon the defendant. (19 Cal.Jur. 697-699.) True, contributory negligence may be found by the trier of fact from the plaintiffs' own evidence. But cases in which it can be said that the negligence of plaintiff contributes proximately to the accident as a matter of law are rare. The rule has been stated in various ways in a legion of cases, that contributory negligence is not established as a matter of law unless the only reasonable hypothesis is that such negligence exists; that reasonable or sensible men could have drawn that conclusion and none other; that where there are different inferences that may be drawn, one for and one against, the one against will be followed; and that before it can be held as a matter of law that contributory negligence exists, the evidence must point unerringly to that conclusion. (Citing cases.)"

■ Likewise, in *Bady* v. *Detwiler*, 127 Cal.App.2d 321 [273 P.2d 941], it is appropriately said (at p. 339):

"It is only where no fact is left in doubt, and no deduction or inference other than negligence can be drawn by the jury from the evidence, that the court can say, as a matter of law, that contributory negligence is established. Even where the facts are undisputed, if reasonable minds might draw different conclusions upon the question of negligence the question is one of fact for the jury. (Citing cases.)"

We have reviewed the entire record in this case, and we find no prejudicial error.

The judgment is affirmed.

White, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied September 3, 1958, and appellant's petition for a hearing by the Supreme Court was denied October 10, 1958. Schauer, J., was of the opinion that the petition should be granted.