418 P.2d 401

**Minola F. CAMPBELL and Philip S. Malinsky, as Administrator of the Estate of Lem W. Campbell, Deceased, Appellants,**

**v.**

**CITY OF TUCSON, Appellee.***

**No. 2 CA–CIV 263.**

Court of Appeals of Arizona.

Sept. 27, 1966.

Rehearing Denied Oct. 31, 1966.

---

Healy, Laubscher & Dickerson, by Vernon F. Dickerson, Tucson, for appellants.

---

* This appeal was filed with the Arizona Supreme Court and assigned that court's No. 8473. The matter was referred to this court pursuant to A.R.S. section 12–120.23.

Chandler, Tullar, Udall & Richmond, by Robert S. Tullar, Tucson, for appellee.

MOLLOY, Judge.

This is an appeal from a judgment rendered in favor of the defendant, City of Tucson, on a directed verdict by the court. The action is one for personal injuries and wrongful death arising out of an intersection accident occurring in Tucson, Arizona, on March 2, 1962.

At about 9:15 p. m., on this date, a pickup and a passenger car collided at the intersection of Grant and Alvernon Boulevards, two major traffic arteries of the City of Tucson. The pickup, being driven in a westerly direction on Grant, was owned by the plaintiff, Campbell, and was operated at the time by Mr. Campbell, who was killed in the collision. The Wilson car, proceeding in a northerly direction on Alvernon, was operated by Mrs. Wilson who had with her as a passenger her future daughter-in-law. As a result of the accident, in addition to the death of Mr. Campbell, there were personal injuries to Mrs. Campbell and the two occupants of the Wilson car.

All witnesses agreed that at the time of the accident the traffic directing signal suspended from the center of the intersection was not operative. Approximately twenty minutes prior to the accident a police officer had been through the intersection, at which time the signal was properly functioning, alternating between red, amber and green as is customary with traffic lights in the Tucson area. After the accident, it was discovered that the power switch controlling electric power to the signal in question had been tampered with by some unknown person. The switch in question was attached to the side of a wooden power pole at one of the corners of the intersection with the bottom of the box being " * * * within a couple of inches * * *" of seventy-three inches above the ground. The switch box is metal and is approximately five inches wide, eight and one-half inches high and three and one-half inches deep. Outside of the switch box and on the right-hand side thereof is a lever-like handle about three inches long for engaging and disengaging the switch inside the box. The switch in question, as manufactured, had a hasp provided for locking the switch in the "off" position but no method of locking the control handle in the "on" or "up" position. This particular switch box had originally been installed by county traffic officials, before the city annexed the particular intersection into the city limits in March of 1959.

As originally installed by the county, there had been improvised a wire restraining device, to hold the switch arm in question in the "on" position, and this was still being used at the time of the accident. The wire used was an eleven gauge steel wire which was fastened in the back of the box with a wooden screw into the wooden pole. The wire was wrapped around the switch arm in such manner that it was not possible to pull the arm into the off position without untwisting the wire wrapped around the switch handle. The wire in question was of such tensile strength that it was not possible to untwist the wire with the bare hands, but the same could be done with a pair of pliers, or a nail or similar device to twist the wire.

The city had a program of replacement of this type of a switch box with a newer one in which the switch control was internal to the box rather than external. Such new type of switch box was locked with a padlock. This practice of improving this type of switch had not as yet reached the box in question. The city had one full-time maintenance man to maintain between one hundred five and one hundred ten signals in the city, while the national average was to have one maintenance person for each thirty-five signals. The city had no prior warning of any malfunctioning of this particular signal. Within five months prior to the accident in question, two switch boxes in the neighborhood of the University of Arizona had been tampered with but both switches which had been disengaged were inside the new type of padlocked box.

Testimony from the traffic director of the defendant-city indicated that there were

approximately 22,000 cars daily entering the intersection in question. The evidence as to the occurrence of this accident will support the conclusion that the driver of either one or both vehicles was misled by the absence of a signal light ahead into believing that stop signs protected his or her vehicle from traffic proceeding from crossing streets.[1]

■ . The only question raised on appeal is whether there was sufficient evidence to go to the jury on the question of the defendant's negligence and proximate cause. On appeal, a directed verdict having been granted below, we must regard the evidence in the light most favorably to the position of the appellant, Lantay v. McLean, 2 Ariz. App. 22, 406 P.2d 224 (1965), LeRoy v. Phillips, 97 Ariz. 263, 399 P.2d 669 (1965), and we have so stated the evidence in this opinion.

Though the briefs have broken down the problems before this court into the categories of negligence and proximate cause, we believe that it is appropriate in this case to discuss these two concepts together.

■ That a traffic signal or device negligently installed or maintained may be the proximate cause of an accident and a basis of liability of the public body responsible is impliedly conceded by the appellee. Authorities permitting recovery when there has been no intervening act of a third person, such as Richardson v. State of New York, 28 Misc.2d 607, 218 N.Y.S.2d 922 (1961), Buckley v. City of Chicago, 3 Ill.App.2d 39, 120 N.E.2d 375 (1954), Bady v. Detwiler, 127 Cal.App.2d 321, 273 P.2d 941 (1954), and Johnston v. City of East Moline, 405 Ill. 460, 91 N.E.2d 401 (1950), are distinguished but not criticized by the appellee.

The grounds of distinguishing these cases is that here we have the intentional intervening act of a third person which is the immediate cause of this accident. Perti-

nent law in the Restatement of the Law of Torts (Second), reads as follows:

"§ 302 B. Risk of Intentional or Criminal Conduct

"An act or an omission may be negligent if the actor realizes or should realize that it involved an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal."

"Comment:

\* \* \* \* \* \* \*

"*f*. It is not possible to state definite rules as to when the actor is required to take precautions against intentional or criminal misconduct. As in other cases of negligence (see §§ 291–293), it is a matter of balancing the magnitude of the risk against the utility of the actor's conduct. Factors to be considered are the known character, past conduct, and tendencies of the person whose intentional conduct causes the harm, the temptation or opportunity which the situation may afford him for such misconduct, the gravity of the harm which may result, and the possibility that some other person will assume the responsibility for preventing the conduct or the harm, together with the burden of the precautions which the actor would be required to take. Where the risk is relatively slight in comparison with the utility of the actor's conduct, he may be under no obligation to protect the other against it."

"§ 449. Tortious or Criminal Acts the Probability of Which Makes Actor's Conduct Negligent

"If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which

1. Part of the testimony of Mrs. Wilson, the driver of the passenger car proceeding north:
 "Q As you approached [Grant Road], when you got to the intersection, you

assumed that whatever street this was, traffic eastbound or westbound on the street was required to stop?
 "A Yes."

makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby."

 Under the evidence presented here, we do not believe that a court is justified in ruling as a matter of law that reasonable men could not conclude that the city should have realized that there was an unreasonable risk of the switch arm in question being pulled by some malicious wrongdoer. We believe that reasonable persons might conclude that an exposed switch handle such as this is more attractive to the mischief-maker than a handle concealed in a box and that a twisted wire, which may be readily disengaged with a pliers or other metal object, is not an appropriate manner to secure such a switch under the circumstances. The height of the box places it within reach of most adults and the switch handle in question would have been easily visible to any children passing. We believe that reasonable persons might conclude that a twisted wire is more apt to be tampered with than a padlock, thus making significant the fact that the city had notice that two switch boxes with padlocks had been tampered with in recent months. The volume of traffic at the particular crossing and the obvious dangers resulting from a malfunctioning of a signal such as this are influencing factors which prompt this court to conclude that a verdict was wrongfully directed.

Reversed for new trial.

HATHAWAY, J., and ROBERT O. ROYLSTON, Superior Court Judge, concur.

NOTE: Judge HERBERT F. KRUCKER having requested that he be relieved from consideration of this matter, Judge ROBERT O. ROYLSTON was called to sit in his stead and participate in the determination of this decision.