[Civ. No. 34982. Second Dist., Div. Four. Nov. 30, 1970.]

ANDREW J. MARINCOVICH, Plaintiff and Respondent, v.
ORIANA, INC., Defendant, Cross-complainant and Appellant;
MARINE TERMINALS CORPORATION OF LOS ANGELES,
Defendant, Cross-defendant and Appellant;
CITY OF LONG BEACH, Cross-complainant and Appellant;
FIREMAN'S FUND AMERICAN INSURANCE COMPANY,
Intervener and Respondent.

## COUNSEL

Graham & James and Don A. Proudfoot, Jr., for Defendant, Cross-complainant and Appellant.

Garibaldi & Lane and Abe Mutchnik for Defendant, Cross-defendant and Appellant.

Kirtland & Packard and Austin C. Smith, Jr., for Cross-complainant and Appellant.

George E. Shibley, Margolis, McTernan, Smith, Scope & Herring and Ben Margolis for Plaintiff and Respondent.

No appearance for Intervener and Respondent.

## OPINION

**FRAMPTON, J.**[*]—

### Statement of the Case

Plaintiff brought his action against defendants Marine Terminals Corporation of Los Angeles (hereafter Terminals) and Oriana, Inc. (hereafter Oriana), seeking damages for personal injuries sustained while he was acting as a linesman in the course of docking the ship *Oriana*. Plaintiff's cause of action was based upon negligence and unseaworthiness. Fireman's Fund American Insurance Company intervened as the workmen's compensation insurance carrier of plaintiff's employer, National Lines Bureau, Inc.

Oriana filed its cross-complaint against the City of Long Beach (hereafter City) wherein Oriana sought indemnity against the City as the owner of the pier where the accident occurred, in the event Oriana was held liable to plaintiff in damages. The City filed its cross-complaint against Terminals, who, under contract with the City, occupied that portion of the dock where the accident occurred, wherein the City sought indemnity from Terminals to the extent that City might be held liable to Oriana. Judgment was rendered in favor of plaintiff and against Terminals and Oriana in the sum of $38,623.25, in favor of the intervener Fireman's Fund American Insurance Company and against Terminals and Oriana in the sum of $1,041.75, in favor of the City and against Oriana on Oriana's cross-complaint, and in favor of Terminals and against the City on the City's cross-complaint. All parties except plaintiff and intervener appeal from the judgment.

### Statement of Facts

The City is the owner of the pier upon which the accident occurred. The area of the pier designated as berth number 7 was in the possession of, and was operated and maintained by Terminals under an agreement with the City. At the instance and request of Terminals, the City had constructed a fence, later involved in plaintiff's injury, to the specifications submitted by Terminals. It appears that the City had erected the fence for Terminals, a handler of ship's cargo, after various steamship lines had requested its erection because it was deemed necessary to protect members of the general public from personal injury and to prevent pilferage of ship's cargo.

On January 31, 1965, the date of the accident, plaintiff, Marincovich, an employee of National Lines Bureau, Inc., was dispatched with his partner, James Ford, to berth 212 in the City of Long Beach to assist in shifting the

---

[*]Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

■

vessel *Oriana* to berth 9. When the ship was ready to go, Marincovich and his partner released the bow lines and they fell into the water. Marincovich and his partner then proceeded to berth 9. Sometime before the ship reached berth 9, a member of the Harbor Guard, an employee of the City, changed the docking instructions and directed the *Oriana* to berth 7.

The fence above mentioned divides berth 7 from berth 6. It is approximately 6 feet in height, topped with three strands of barbed wire. It runs from the terminal shed to a post implanted just inside of the raised edge timber of the pier which runs along the water's edge of the pier. There is a swinging gate, which will swing in either direction, hinged at the post on the side away from the water. Toward the water from the post the fence is composed of pipes running diagonally from the top of the post across the raised edge of the pier towards the water. There are vertical bars mounted on the diagonal pipes forming a barrier which blocks passage between berth 6 and berth 7 along the raised edge of the pier whether the gate is open or closed.

On the berth 6 side of the fence another vessel, the *Arizona,* was moored with its stern some 50 feet on the berth 6 side of the fence. One of the *Arizona's* stern lines ran from its stern to a bollard on the berth 7 side of the fence some distance back from the fence.

As the *Oriana* approached the berth, a spring line (a line designed to arrest the vessel's forward motion) was thrown to Marincovich and Ford and was secured by them on the berth 7 side of the fence. Next a heaving line (a light line designed for throwing to which a heavier mooring line is attached) was thrown with the first head or bow line attached. Once Marincovich and Ford had the heaving line, the bow line was slacked off by the vessel's personnel into the water. By this time the Harbor Guard had advised that the vessel was to be hard up, that is as close as possible to the fence marking the end of berth 7. It was then obvious that the bow line had to be secured on the berth 6 side of the fence.

Ordinarily, this would have been accomplished by "floating" the bow line to a point adjacent to the bollard on the berth 6 side of the fence and then lifting the eye of the line out of the water and securing it; or in the alternative, at a berth where there was no fence, by pulling some slack in the bow line onto the dock adjacent to where the line was received from the vessel and then walking it forward to the bollard.

The former method could not be utilized because the bow of the *Oriana* sat higher in the water than the stern of the *Arizona* making it necessary to place the bow line of the *Oriana* over the stern line of the *Arizona* to avoid damage to the lines. The latter method could not be utilized because of the

■

fence. Walking the line through the fence gate would place the line to the shore side of the fence post, and upon the line being taken in by the vessel the seaward portion of the fence would be carried away.

Marincovich and Ford first received the spring line of the *Oriana* and secured it without incident because of its location some 150 feet aft of the bow of the vessel. They next received the heaving line which was attached to the bow line. As they pulled up the heaving line, the crew of the *Oriana* slacked the bow line down into the water. Marincovich and Ford then pulled the bow line up over the stern line of the *Arizona*. They then pulled enough of the bow line onto the pier so that there would be slack enough (a bite in the line) to allow the eye of the line to be lifted over the fence and be picked up from the the other side and fastened to a cleat or bollard. Marincovich described the line as "a little heavier being wet" than a dry line. Ford described the line as "so doggone heavy on account of putting it in the water."

When sufficient slack in the bow line was accumulated on the pier, Marincovich lifted a portion of the slacked line behind the eye over the fence. When he attempted to lift the eye of the line over the fence and while holding it over his head, he lost his balance and struck his "elbow on the upright of the fence as I put the line over." Marincovich estimated the weight of the line that he was lifting at the time of the accident to be 75 to 100 pounds. He testified "I had this weight over my head, and I lost my balance. The line was heavy. I didn't realize it was going to be that heavy in preparation of throwing it over the fence. As near as I can remember, that is when I hurt my elbow, when I lost my balance." At the time of his fall, he was standing on the raised edge of the pier consisting of a timber at the water's edge about 14 to 16 inches in width. In the circumstances here shown, had the fence not been constructed across the timber forming the raised edge of the pier, Marincovich could have walked the bow line along the raised edge of the pier, past the fence to the cleat or bollard where the line was to be fastened.

Captain Larkin F. Crawford, a seaman of long experience and a qualified expert in maritime matters, testified that the fence here involved was "particularly unsafe in this case creating a hazard that the lines are coming over the top."

Rule 609 of the Pacific Coast Marine Safety Code[1] provides: "In order to provide safe access for handling lines while mooring and unmooring ships,

---

[1]The Pacific Coast Marine Safety Code is a safety code adopted by the Longshoremen's Union and various ship operating and stevedoring companies on the Pacific Coast.

lumber and other cargo should not be piled within approximately four feet of the edge of any wharf or pier."

Captain Crawford testified further that "when a linesman is handling lines, primarily, it's a hazardous job to begin with and if you increase this hazard by obstruction of any kind, well, it makes it much more hazardous." The reason for rule 609 is that the existence of any obstacle in the area referred to by the rule creates a hazard. A fence in the area is more dangerous than cargo such as lumber which can be moved as compared to a fence which cannot be moved. A linesman has to work with considerable speed because getting the line ashore as fast as possible is very important.

Complaints about the fence were general among the linesmen because they could not get around the fence and therefore had to go over it the way the plaintiff did. Mr. Ford, Marincovich's coworker, testified that he considered it unsafe to work as a linesman in the area of the fence.

Captain Crawford testified further that allowing the lines from the *Oriana* to go down into the water was not consistent with good seamanship because it increased the weight of the lines which the men on the dock were required to handle. The presence of the fence, constructed in the manner and located in the position that it was, constituted a hazard for the mooring of the ship in that particular location. The linesman's job is hazardous because, in addition to the speed with which the job has to be done while working at the edge of the dock, lines are usually heavy and men have to exert great effort in handling them and in getting them from the bow of the ship to where the bollard is located, just as a seaman's job is often hazardous but is something that has to be done. A wet line makes the job more hazardous and a good careful mate tries to keep the line from going into the water while it is being pulled ashore. With a good mate, allowing the line to get wet is a rare occurrence.

The trial court found that Terminals was negligent in causing to be constructed, and in maintaining the fence between berth 6 and berth 7, and that the fence created a dangerous and unsafe place for Marincovich to work. The court also found that *Oriana* was negligent in permitting its mooring lines to be dropped into the water thereby causing them to become wet, heavier and more difficult to handle, and that Marincovich's injuries were caused by the concurrent negligence of Terminals and Oriana.

### Contentions on Appeal

Oriana contends that (1) it was improperly held liable to Marincovich on a negligence theory, and (2) Oriana is entitled to indemnity from the City.

The City urges that (1) the recognized principles of the law of indemnity preclude recovery by the indemnitee when its primary or active conduct contributes to the loss, and therefore, Oriana is precluded from obtaining indemnification from the City, and (2) if the City were found liable to indemnify Oriana, then the City is entitled to indemnification by Terminals because the subject fence was constructed at the request of Terminals in accordance with the latter's plans and specifications.

Terminals contends that (1) the evidence is insufficient as a matter of law to sustain the finding of negligence in its causing the fence to be constructed and in maintaining it at the place where the fence was constructed; (2) assuming that the erection and maintenance of the fence constituted negligence, Marincovich's injury was not proximately caused thereby, but instead was caused by the independent intervening negligence of *Oriana* in allowing its mooring lines to fall into the water thus making them heavy and unwieldy, and (3) Marincovich was guilty of contributory negligence as a matter of law.

ORIANA'S APPEAL

*Negligence of Oriana*

Oriana contends that the evidence is insufficient to show negligence on its part which was a proximate cause of plaintiff's injuries. This argument is based upon the claim that Marincovich and Ford first dropped the mooring line into the water when the vessel cast off from berth 212 to move to berth 9. Oriana argues that this was an act of negligence on the part of Marincovich, and the line then being already wet and heavy, as the result of Marincovich's own act, Oriana should not be held liable for the already wet line to be again passed through the water.

This argument ignores the fact that the mooring line had been taken up out of the water and placed on the deck of the vessel when it left berth 212. This afforded some opportunity for the line to dry out at least partially before the line was thrown into the water by the crew of the vessel when it arrived at berth 7. To the extent that the line still retained moisture from its first immersion in the water, it rendered the line heavier than it would have been if it was completely dry. To take such a line and throw it into the water and permit it to soak up more moisture was to cause the line to become still heavier and still more dangerous to handle precisely at the time when it was most important to avoid doing so. In these circumstances there is sufficient evidence to support the finding of negligence on the part of Oriana in allowing the line to become wet, heavier and thereby more difficult to handle.

Oriana argues that, assuming that the vessel's personnel made the bow line in question heavier by allowing it to go into the water, their conduct

was not negligent unless they knew or should have known of the circumstances that required the line to be thrown over the fence.

An examination of the photographs in evidence reveal that the condition of the fence was open and obvious, and if the members of the crew of the *Oriana* could see Marincovich and his coworker on the dock when the lines were thrown to them, they could also as easily see the fence. The trial judge observed, during argument, that the fence "was in plain sight." Oriana is chargeable with knowledge of conditions which were in plain sight. (Cf. McKinney, New Cal. Dig., Negligence, § 74(13) and cases cited.)

There was testimony that the job could have been performed safely under existing conditions if there had been a third linesman present to help Marincovich get the line over the fence. Four men were dispatched from the Lines Bureau to work the *Oriana*, which meant that two were assigned to the bow and two to the stern of the vessel. The arrangements for the four men were made either by the *Oriana* directly or by someone in its behalf, and it was chargeable with knowledge that only four men were ordered. Furthermore, the number of linesmen on the dock was clearly visible from the vessel, and there is nothing in the record to indicate that there were three linesmen available at the bow.

There was also evidence that if there had been a piece of equipment known as a cherry picker available it could have picked up the line and put it over the fence. The presence of such a piece of equipment large enough to do the job would also be plainly visible and its non-existence would be apparent to the *Oriana*.

We are of the opinion that there is sufficient evidence in the record to sustain the trial court's finding of negligence on the part of the *Oriana* and that such negligence was a proximate cause of plaintiff's injuries.

### *Indemnity From City to Oriana*

Oriana urges that the City owned the pier on which the accident occurred. As between the *Oriana* and the City, the City was the wharfinger. The City built the offending fence, albeit to Terminals' specifications. It was City's Harbor Guard that directed the *Oriana* to its mooring at berth 7. From these circumstances Oriana argues that it is entitled to indemnification from the City for the amount of damages Oriana is obligated to pay by reason of the judgment herein.

In *Ryan Stevedoring Co.* v. *Pan-Atlantic SS. Corp.*, 350 U.S. 124 [100 L.Ed. 133, 76 S.Ct. 232], *Ryan* had agreed to perform all stevedoring operations required by Pan-Atlantic in its coastwise service. The contract contained no express indemnity agreement. Ryan negligently loaded pulpboard

on one of Pan-Atlantic's ships at Georgetown, South Carolina. The cargo was loaded under the immediate direction of Ryan's hatch foreman. The ship's cargo officers supervised the loading of the entire ship and had authority to reject unsafe stowage. Upon arrival at Brooklyn, New York, the vessel was unloaded by longshoremen in the employ of Ryan. Palazzolo, one of Ryan's employees, while engaged in unloading the pulpboard, was injured due to the insufficient method used in stowing the material at the port of origin. Palazzolo sued the shipowner claiming unseaworthiness of the ship. Pan-Atlantic filed a third party complaint against Ryan seeking indemnification for the amount in damages which it might be obligated to pay Palazzolo. A judgment of $75,000 was rendered against Pan-Atlantic and in favor of Palazzolo. The trial court dismissed the third party complaint. The Court of Appeals affirmed Palazzolo's judgment but reversed the dismissal of the third party complaint and directed judgment in favor of Pan-Atlantic. The Supreme Court in affirming the Court of Appeals held that "The shipowner here holds petitioner's [*Ryan's*] uncontroverted agreement to perform all of the shipowner's stevedoring operations at the time and place where the cargo in question was loaded. That agreement necessarily includes petitioner's obligation not only to stow the pulp rolls, but to stow them properly and safely. Competency and safety of stowage are inescapable elements of the service undertaken. This obligation is not a quasi-contractual obligation implied in law or arising out of a noncontractual relationship. It is of the essence of petitioner's stevedoring contract. It is petitioner's warranty of workmanlike service that is comparable to a manufacturer's warranty of the soundness of its manufactured product." (Pp. 141-142.) The Supreme Court went on to say that "Whatever may have been the respective obligations of the stevedoring contractor and of the shipowner to the injured longshoreman for proper stowage of the cargo, it is clear that, as between themselves, the contractor, as the warrantor of its own services, cannot use the shipowner's failure to discover and correct the contractor's own breach of warranty as a defense. Respondent's [Pan-Atlantic's] failure to discover and correct petitioner's own breach of contract cannot excuse that breach." (P. 142.)

In *Ware* v. *Cia De Navegacion Andes, S.A.*, 180 F.Supp. 939, where the employee of the wharfinger operating under contract with the stevedoring company, in the negligent operation of a crane in loading a vessel, caused the death of a member of the crew of the vessel, it was held that the vessel was the third party beneficiary of the implied warranty of the wharfinger to the stevedoring company that it would perform its work in a reasonably safe and workmanlike manner, and that the vessel was entitled to indemnification from the wharfinger for the decedent's burial expenses. There was no

evidence of negligence on the part of the ship's crew or unseaworthiness of the vessel which was a proximate cause of the death.

In *Ammesmaki* v. *Interlake Steamship Company*, 342 F.2d 627, the facts disclose that the Chicago & North Western Railway Company operated an iron ore dock on Lake Michigan. Interlake Steamship Company, plaintiff's employer, owned the vessels *Crete* and *Verona*. These ships were at North Western's dock loading cargoes of ore. To board the *Crete* from the dock, seamen were required to travel a stairway inside the dock structure and then onto a fender which led to a boarding ladder on the side of the *Verona*. From that vessel they crossed over to the *Crete* which was tied up to her sister ship. At the time of the accident giving rise to the suit, water had dripped off the dock superstructure and formed ice on the fender. Ammesmaki, on returning from the shore to the *Crete,* slipped and fell on the icy fender, suffering injuries as a result of the fall.

Interlake maintained that the icy condition of the railroad's dock was the cause of Ammesmaki's fall. The railroad claimed that the fault lay with the *Verona's* master in failing to place the ship's boarding ladder adjacent to the stairway, that if the ladder had been properly located plaintiff would not have been required to walk on the fender.

Interlake sought indemnity against the railroad by interpleading it in a third party action. Ammesmaki's claim against Interlake and Interlake's claim for indemnity were submitted to a jury in a single trial. The jury returned its verdict in favor of Ammesmaki and against Interlake in the sum of $54,357.75. By separate verdict in the third party action, Interlake was awarded damages against North Western in the sum of $11,958.70. Motions n.o.v. on the part of both Interlake and North Western were denied.

The trial court instructed the jury that "Interlake had the burden of proving it 'was not guilty of negligence in providing for the safety of its employees, including plaintiff' and the further burden of proving that 'negligence of the third party defendant was the sole proximate cause of the injury to the plaintiff.' " (342 F.2d 627, 632.)

The circuit court reversed, holding that the giving of the foregoing instruction was error, stating that "Both Ryan [*Ryan Co.* v. *Pan-Atlantic Corp.,* 350 U.S. 124, 100 L.Ed. 133, 76 S.Ct. 232] and Weyerhaeuser [*Weyerhaeuser S.S. Co.* v. *Nacirema Co.,* 355 U.S. 563, 567, 2 L.Ed.2d 491, 78 S.Ct. 438, 441] clearly indicated that the negligence of a shipowner does not bar indemnity from a dockowner for the breach of a warranty to maintain the dock in a reasonably safe manner." (342 F.2d 627, 632.)

In *Italia Societa* v. *Oregon Stevedoring Co.,* 376 U.S. 315 [11 L.Ed.2d 732, 84 S.Ct. 748], the facts disclosed that Italia was the owner of the ship

upon which an employee of Oregon, a stevedoring company under contract with Italia to perform its stevedoring requirements, was injured in the course of his employment. The injury was caused by the breaking of a defective rope furnished by Oregon pursuant to its contract. The defect in the rope which caused it to break was latent.

The injured longshoreman recovered judgment against Italia in the state court based upon alleged negligence and unseaworthiness. Italia satisfied the judgment and thereupon brought suit in a federal district court against Oregon for indemnification. The district court disallowed indemnification because Italia had failed to prove negligence on the part of Oregon since the condition of the rope was not apparent. The circuit court affirmed, but solely on the ground that a stevedore's implied warranty of workmanlike service is not breached in the absence of a showing of negligence in supplying defective equipment. The Supreme Court reversed, holding that "recovery in indemnity for breach of the stevedore's warranty is based upon an agreement between the shipowner and stevedore and is not necessarily affected or defeated by the shipowner's negligence, whether active or passive, primary or secondary." (376 U.S. 315, 321 [11 L.Ed.2d 732, 739].)

In *Weyerhaeuser S.S. Co.* v. *Nacirema Co.,* 355 U.S. 563 [2 L.Ed.2d 491, 78 S.Ct. 438] the facts disclosed that Weyerhaeuser, the owner of the vessel, had shipped a load of lumber to the east coast, part of which was unloaded at New York, and part of which was unloaded at Boston. Nacirema had contracted to furnish stevedoring services to Weyerhaeuser at both ports. At the port of New York the stevedores furnished by Nacirema constructed a winch shelter framework, made of scrap lumber, with a tarpaulin stretched across the top. Because of their flimsy construction, such shelters are considered a hazard at sea and are torn down by the ship's crew when the vessel leaves port. The winch shelter was not removed when the ship left New York and remained in place when the ship arrived in Boston. During the unloading operations in Boston, one Connolly, a longshoreman employed by Nacirema, was injured in the course of his work when struck on the head by a falling timber from the winch shelter.

Connolly sued Weyerhaeuser claiming negligence and unseaworthiness. Weyerhaeuser impleaded Nacirema claiming the right of indemnification for any damages Connolly might recover. The jury found in favor of Connolly on the issue of negligence and against him on the issue of unseaworthiness. After receiving the verdict, the trial judge treated it as dispositive of the third party action and directed a verdict in favor of Nacirema. The circuit court affirmed.

The Supreme Court held that Nacirema's contractual obligation to perform its duties with reasonable safety related not only to the handling of

cargo, as in *Ryan,* but also to the use of equipment incidental thereto, such as the shelter involved here. The court went on to say "If in that regard respondent [Nacirema] rendered a substandard performance which led to foreseeable liability of petitioner [Weyerhaeuser], the latter was entitled to indemnity absent conduct on its part sufficient to preclude recovery." (355 U.S. 563, 567 [2 L.Ed.2d 491, 494].)

In *H & H Ship Service Co.* v. *Weyerhaeuser Line,* 382 F.2d 711, Weyerhaeuser had contracted with H & H for the latter to do certain painting and scraping on a vessel belonging to Weyerhaeuser. Preliminary to the commencement of work, one Grant, who was in charge of the H & H crew of ship cleaners, went into the hold of the vessel to inspect certain areas where the work was to be performed. Grant was accompanied by one Mandle, Weyerhaeuser's Assistant Port Engineer, who was to point out to Grant the areas of the vessel which needed attention. Mandle alone carried a light which proved insufficient to light the area of the hold. During the inspection Grant fell from a beam into the bottom of the hold sustaining personal injuries from the fall. Grant sued Weyerhaeuser and Weyerhaeuser sued H & H seeking indemnity. The two actions were consolidated for trial. Grant settled his suit against Weyerhaeuser and the action proceeded on the complaint for indemnity resulting in a judgment in favor of Weyerhaeuser. The circuit court affirmed, holding that it was part of Grant's duties to inspect the job before assigning his men to do the repairs; he was an experienced ship cleaning foreman and had control of his own actions. The court held that the warranty of workmanlike service applied. It referred to *Weyerhaeuser S.S. Co.* v. *Nacirema, supra,* as authority for the rule that the vessel owner was entitled to indemnification from a substandard performing stevedore " 'absent conduct on its part sufficient to preclude recovery.' " (382 F.2d 711, 713.)

The circuit court went on to say that "The Supreme Court has not indicated what conduct will be sufficient to preclude recovery, and the question has given rise to some confusion." (382 F.2d 711, 713.)

It has been held that whatever fault of a shipowner may be said to relieve the stevedore of his duty under the warranty, it seems plain that it must at the least prevent or seriously handicap the stevedore in his ability to work. (*Rederi A/B Nordstjernan* v. *Crescent Wharf & Warehouse Co.,* 372 F.2d 674, 676.)

In *Crumady* v. *The J. H. Fisser,* 358 U.S. 423 [3 L.Ed.2d 413, 79 S.Ct. 445], a stevedore's employee, injured by the fall of a winch boom while unloading a vessel, brought an admiralty action in rem against the ship. The ship was held unseaworthy in that the safety cut-off device for a winch was set, by employees of the ship, at twice the tonnage limit of the winch rigging.

At the time of the accident the winch had been turned over to and was being operated by employees of the stevedore. The Supreme Court held that the stevedore in overloading the winch brought the unseaworthy condition of the vessel into play, and that the ship was entitled to indemnification from the stevedore for its unseaworthiness liability to the stevedore's employee.

The foregoing authorities, some of which are cited and relied on by Oriana in support of its claim of the right of indemnification from the City, illustrate that the implied contract between the shipowner and the stevedoring company or the wharfinger, as the case may be, that the latter will perform its work in a reasonably safe and workmanlike manner, is construed strictly in favor of the shipowner, and that negligence on the part of the crew of the vessel which may contribute to the injury does not necessarily defeat the vessel's right to claim indemnification from the stevedoring company or the wharfinger.

The trial court found that "The mooring line here involved, wet or dry, was not unsafe for the use for which it was intended under ordinary conditions which the ship could reasonably have expected to confront; however, because of the extraordinary condition existing by virtue of the fence hereinabove referred to and the location and the manner in which the SS Arizona was moored at that time, the wet line was unsafe for handling; the vessel was not thereby rendered unseaworthy because the wet line was unsafe only because of the existence of the above described extraordinary condition on land."

The court also found that "It is untrue that plaintiff's injuries were caused solely by the presence of the said gate and fence but that it is true that it was caused by the concurrent negligence of defendants Marine Terminals Corporation of Los Angeles and Oriana, Inc., as above set forth."

In its supplemental findings the court found that "1. It is true that the City of Long Beach, through its employees and contractors, was responsible for and did in fact select the berth for the SS ORIANA on or about January 31, 1965; and it is true that on or about said date it did first select Berth 9 and subsequently changed its selection to Berth 7; and it is further true that it selected and determined the position at Berth 7 for the mooring of the SS ORIANA on said date.

"2. It is true that neither the owners, the operators, the crew nor the officers of the SS ORIANA had any knowledge, prior to arrival at Berth 7 on January 31, 1965, of conditions at Berth 7 and, in particular, had no knowledge of any hazard or dangerous condition created by the fence at Berth 7."

The trial court absolved the City from liability to Marincovich by finding that the City was not primarily responsible for the dangerous and unsafe

condition resulting from the construction of the fence, in that the fence was constructed in the manner and in the place requested of the City by Terminals. This finding does not alter the respective rights, duties and obligations as between the *Oriana* and the City which must be resolved by the rules applicable to their relationship under maritime law.

We are of the opinion that the evidence and the findings of the trial court point unerringly to the conclusion that the unseaworthy condition of the *Oriana* was brought into play by the erection and maintenance of the fence on the City's pier, and that under the rule laid down in *Crumady* v. *The J. H. Fisser,* 358 U.S. 423 [3 L.Ed.2d 413, 79 S.Ct. 445], the *Oriana* is entitled to indemnification from the City in the amount of the judgment rendered against Oriana in the main action.

### CITY'S APPEAL

The City's first contention that the *Oriana* is precluded from obtaining indemnification from the City because Oriana's primary or active conduct contributed to the injuries sustained by Marincovich, as heretofore pointed out, cannot be sustained under the application of admiralty law to the obligation owed by City to the *Oriana* to provide the latter with a reasonably safe pier upon which it could bring its vessel to berth.

Next, the City urges that if it is obligated to indemnify Oriana, then the City is entitled to indemnification from Terminals because the subject fence was constructed at the request of Terminals in accordance with the latter's plans and specifications.

The City does not claim the right of indemnification from Terminals under an express contract providing therefor. (Cf. *Goldman* v. *Ecco-Phoenix Elec. Corp.* 62 Cal.2d 40, 41 [41 Cal.Rptr. 73, 396 P.2d 377]; *Dart Transportation Service* v. *Mack Trucks, Inc.,* 9 Cal.App.3d 837 [88 Cal.Rptr. 670].)

The City cites and relies upon *City & County of S. F.* v. *Ho Sing,* 51 Cal.2d 127 [330 P.2d 802]; *Herrero* v. *Atkinson,* 227 Cal.App.2d 69 [38 Cal.Rptr. 490], and *Aerojet General Corp.* v. *D. Zelinsky & Sons,* 249 Cal.App.2d 604 [57 Cal.Rptr. 701], in support of its claim.

In *City & County of S.F.* v. *Ho Sing,* the predecessor in interest of Mr. and Mrs. Ho had installed a sidewalk skylight in front of the building which they owned. The skylight was over a basement maintained by Ho. During the course of possession of the property by Ho, the sidewalk skylight developed a crack. Mrs. Wagner tripped and fell because of the crack, breaking her hip. She sued both the city and Mr. and Mrs. Ho, and recovered judgment against both. The city paid a part of the judgment then brought an action

for indemnification against the Hos for that part of the judgment which it had paid. The trial court sustained defendants' demurrer to the city's complaint without leave to amend. The Supreme Court reversed holding that (p. 138), "where an adjoining property owner for the exclusive benefit of his own property places in a public street or sidewalk some artificial structure and a city is compelled to pay compensation in damages to a member of the public injured thereby the city has a right to recover the amount so paid from the property owner by way of indemnity."

The case of *Herrero* v. *Atkinson* involves facts entirely different from the case here under consideration and furnishes no support for the City's claim to the right of indemnification from Terminals.

*Aerojet General Corp.* v. *D. Zelinsky & Sons* involved actions wherein Aerojet was sued for the wrongful death of two employees of Zelinsky, caused by an explosion while decedents were engaged in painting the interior of a tank on premises owned by Aerojet. Zelinsky was an independent painting contractor in full control of the work. Aerojet settled the litigation then sought indemnity against Zelinsky. The trial court awarded indemnity and the Supreme Court affirmed, stating, "Aerojet's claim for reimbursement is based upon the doctrine of implied indemnity. When applicable, the doctrine permits one of two tortfeasors to shift the entire loss to the other when, without active fault on the former's part, he has been compelled by reason of some legal obligation to pay damages occasioned by the immediate negligence of the latter. [Citation omitted.]

"Implied indemnification may rest upon equitable considerations, impelled by a contrast between the secondary, passive role of one tortfeasor and the primary, active role of the other. [Citation omitted.] It may also rest upon a contractual relationship between indemnitor and indemnitee, predicated upon the former's breach of an implied contract to perform the work carefully and to discharge foreseeable damages resulting from that breach. [Citation omitted.]

"Whichever is the theoretical premise, equitable or implied contractual, the indemnity claimant's active participation in the wrong will usually preclude his recovery." (249 Cal.App.2d 604, 607.)

In the case at bench the City owned and operated the wharf in its proprietary capacity. (Cf. *General Petroleum Corp.* v. *Los Angeles,* 22 Cal. App.2d 332, 335 [70 P.2d 998]; *Ravettino* v. *City of San Diego,* 70 Cal. App.2d 37, 44 [160 P.2d 52].) The wharf at berth 7 was not a public street or sidewalk in the sense that the general public had the right to use it as a public highway. Under the agreement whereby Terminals occupied

the wharf, the City was the landlord and Terminals was the tenant. The City was under no duty or obligation to Terminals to construct the fence in the manner and at the location requested by Terminals. If the City felt that it was to its financial advantage to construct, at the request of its tenant, a barrier on its pier designed to prevent the general public from wandering onto the wharf and thus become exposed to danger of personal injuries from activities carried on by the City's tenants, and to prevent pilferage of cargo situated on the wharf, the City had the option to construct such a barrier in a manner that would not constitute a danger and hazard to linesmen while engaged in their work of docking vessels.

The fence at berth 7 as constructed by the City was found, from its manner and place of construction, to be a danger and hazard to linesmen in the performance of their work. While Terminals, under its contract with the City, was obligated to repair and maintain the fence, there is nothing in the record to show that Terminals ever changed or modified the fence in any manner since its erection by the City. Thus, if the fence constituted a danger and hazard to linesmen in the performance of their work on the day of plaintiff's injury, it did not become so by reason of any changes or modifications made by Terminals, but was dangerous and hazardous from the moment it was installed by the City. The City, therefore, was guilty of active negligence in the manner and place of construction of the fence. Furthermore, it was an employee of the City who directed the *Oriana* to its mooring at berth 7. The evidence is undisputed from the position of the stern of the *Arizona,* the bow of the *Oriana* and the location of the fence, that when the Harbor Guard ordered the *Oriana* to berth close-up, the only way to accomplish this maneuver was to pass the bow line of the *Oriana* over the stern line of the *Arizona* and then to a cleat or bollard on the berth 6 side of the fence. The evidence is also undisputed that from the facilities available, the only way that this could be accomplished was for the linesmen to lift the bow line of the *Oriana* over the fence in order to reach the area of berth 6. The Harbor Guard was charged with knowledge of these conditions and of the hazard created by the fence. The Harbor Guard in ordering the *Oriana* to berth close-up under these obvious conditions constituted active negligence attributable to the City.

In the foregoing state of the record, the finding of the trial court that the City is not primarily liable for the dangerous and unsafe condition of the fence is contrary to the law, and the finding that the Harbor Department, City of Long Beach, through its employees, did not negligently cause the mooring operation to be conducted in a dangerous and unseaworthy area and manner is contrary to the uncontradicted evidence. The City, being guilty of active negligence in the construction of the fence which the trial court found created a danger and a hazard for linesmen required to

handle the mooring lines on any vessel being docked at berth 7, and which condition the court found was a proximate cause of plaintiff's injuries, is not entitled to indemnification from Terminals.

## TERMINALS' APPEAL

Terminals urges that the evidence is insufficient as a matter of law to sustain the finding of negligence on its part in causing the fence to be constructed and in maintaining it. Terminals urges further that assuming the erection and maintenance of the fence constituted negligence, the injury to Marincovich was not proximately caused thereby, but instead, was caused by the independent intervening negligence of Oriana. Neither contention is supported by the record, and both are without merit.

Terminals contends also that Marincovich was guilty of contributory negligence as a matter of law.

The record shows that Marincovich's job was hazardous not only because he was required to work at the dock's edge, but because he also had to work with speed in order to get the line from the bow of the ship to the bollard or cleat on the pier. "The rule has been stated in various ways in a legion of cases, that contributory negligence is not established as a matter of law unless the only reasonable hypothesis is that such negligence exists; that reasonable or sensible men could have drawn that conclusion and none other; that where there are different inferences that may be drawn, one for and one against, the one against will be followed; and that before it can be held as a matter of law that contributory negligence exists, the evidence must point unerringly to that conclusion." (*Anthony* v. *Hobbie*, 25 Cal.2d 814, 818 [155 P.2d 826].) Even where the facts are undisputed, if reasonable minds might draw different conclusions upon the question of negligence the question is one to be determined by the trier of fact. (*Bady* v. *Detwiler*, 127 Cal.App.2d 321, 339 [273 P.2d 941]; *Di Muro* v. *Masterson Trusafe Steel Scaffold Co.*, 193 Cal.App.2d 784, 797 [14 Cal.Rptr. 551].) It has long been recognized that, where a person is required to work in a position of possible danger, the amount of care which he is bound to exercise for his own safety under such circumstances may well be less by reason of the necessity of his giving attention to his work than would otherwise be the case. (*Austin* v. *Riverside Portland Cement Co.*, 44 Cal.2d 225, 239 [282 P.2d 69]; *Di Muro* v. *Masterson Trusafe Steel Scaffold Co.*, supra.) We are of the opinion that the hazard attendant upon the place where Marincovich was required to work, coupled with the urgency under which he was compelled to act quickly as the vessel moved toward its mooring, are factors bearing upon whether he was guilty of negligence in the performance

of his work, and that the record does not compel a finding of contributory negligence on his part as a matter or law.

The judgment in favor of plaintiff and against Marine Terminals Corporation of Los Angeles and against Oriana, Inc., in the sum of $38,623.25 together with costs is affirmed. The judgment in favor of intervener Fireman's Fund American Insurance Company and against Marine Terminals Corporation of Los Angeles and Oriana, Inc., in the sum of $1,041.75 together with costs is affirmed. The judgment in favor of the City of Long Beach and against Oriana on the latter's cross-complaint is reversed with directions to the trial court to amend its findings and conclusions in accordance with the views herein expressed and to enter judgment in favor of Oriana, Inc., and against the City of Long Beach for indemnification in the sum of $39,665, plus costs of suit including reasonable attorneys' fees incurred in defending the main action. The trial court will, of course, tailor its judgment so as to make it clear that Oriana receives indemnification from the City only to the extent that Oriana actually pays the sums involved. Except as herein modified, the judgment is affirmed. Plaintiff shall recover his costs on appeal against Marine Terminals Corporation of Los Angeles and Oriana, Inc. Oriana, Inc., Marine Terminals Corporation of Los Angeles and the City of Long Beach each shall bear its own costs on appeal.

Jefferson, Acting P. J., and Kingsley, J., concurred.

A petition for a rehearing was denied December 21, 1970, and the judgment was modified to read as printed above. The petition of appellant City for a hearing by the Supreme Court was denied January 28, 1971.