[Civ. No. 9026.   Third Dist.   June 19, 1957.]

WILLIAM GOODMAN, a Minor, etc., et al., Respondents, v. ARTHUR WILLIAM RAPOSA et al., Defendants; CITY OF STOCKTON, Appellant.

Monroe N. Langdon and William Biddick, Jr., City Attorneys, Carlisle C. Crosby and Russell A. Harris for Appellant.

A. Brooks Berlin, Alvin A. Lobree, Neumiller, Ditz, Beardslee & Diehl and Irving L. Neumiller for Respondents.

WARNE, J. pro. tem.*—The city of Stockton appeals from a judgment entered against it on a jury verdict in favor of William Goodman, a minor, for personal injuries suffered by said minor and special damages suffered by his mother as the result of said minor being struck by an automobile while in a pedestrian crosswalk at the intersection of East Charter Way and South San Joaquin Street within the city of Stockton.

The cause against the appellant was prosecuted under the Public Liability Act of 1923, now sections 53050 and 53051 of the Government Code.

The accident occurred at approximately 3:45 p. m. on April 7, 1953, at the easterly crosswalk or pedestrian lane located at the intersection of East Charter Way and South San Joaquin Street, in the city of Stockton. It was "broad daylight" at the time, and visibility was good. East Charter Way was and is an arterial thoroughfare, duly posted with stop signs. It is approximately 80 feet wide and runs in a general easterly and westerly direction. South San Joaquin Street intersects at right angles and runs in a general northerly and southerly direction. It is approximately 40 feet wide. East Charter Way is part of State Highway Number 4 as it crosses this particular intersection, and at this point it is in a 35-mile-per-hour speed zone for traffic moving east and west. An electric

---

*Assigned by Chairman of Judicial Council.

traffic signal light is located at each of the four corners of the intersection, the lights controlling traffic by the usual red and green colors to indicate whether traffic is to ''stop'' or ''go.'' These traffic lights were installed and have been in use by the city of Stockton since World War II. They are part of a general and agreed plan of operation and control of traffic along State Highway Number 4, as it passes through the city. There are similar signals two blocks to the west and to the east of the intersection in question and every other block both to the west and to the east thereof for some distance. The maintenance of these signals at all times was the duty of the city of Stockton by joint agreement of the city with the State of California.

Four days prior to the occurrence of the accident, on the morning of April 3, 1953, it was observed that the electric traffic lights at the intersection in question were not working properly. Several hours before noon of that day notice was given to the city, and upon investigation it was discovered that water had seeped into the underground conduit housing the cables that operated the light circuit, and as a result the wires had grounded, and this in turn was causing the traffic lights to flash the colors, or stop and go signals, at the same and improper time. About noontime of the same day the city electrician told the assistant traffic engineer that the lights were in such condition that he felt they should be turned off. The power was then turned off and the light signals put out of operation entirely.

It was ascertained that the short in the wiring occurred at a point somewhat near the center of the street about 35 feet from the signal stand and at the southwest corner of the intersection. From the morning of April 3, 1953, to the time of the accident in the late afternoon of April 7, 1953, a period of four and one-half days, the job of repairing the defective condition and putting the electric traffic signals in operation had not been completed. The job was finally finished on April 9, 1953, and the lights restored to service.

There was testimony to show that the job of repairing the defective signals could have been completed within 20 to 24 man hours of working time.

While the traffic lights were out of order, no substitute measures were taken for the direction of traffic at this intersection.

Defendant James Garcia, an employee of the Cecchini Trucking Company, was driving a truck and trailer loaded

with crates of produce in an easterly direction within the inner of the two eastbound lanes of traffic on East Charter Way. He knew that the traffic signals were not working. As he approached this intersection he saw three boys at the northeast corner, and shortly after seeing them, observed that two of them had started to go southerly across East Charter Way in the marked pedestrian crosswalk immediately to the east of the intersection. He also saw plaintiff, William Goodman, follow the other two boys into the pedestrian lane. Upon observing this, he brought his truck and trailer to a complete stop about 12 feet west of the westerly crosswalk. At this point the three boys were continuing in a southerly direction along the easterly crosswalk. When he started into the intersection the two boys were about halfway across the street with William Goodman immediately behind. When he was about 20 feet from the easterly crosswalk, he saw plaintiff, William Goodman, walk in front of his truck, glance at it for a second and then continue on for five or six steps. At that point William Goodman was struck by a Ford automobile driven by defendant Raposa.

Raposa was also driving easterly on East Charter Way. He was in the outer of the two eastbound traffic lanes. He testified that when he was a block west of the intersection he saw and knew that the traffic lights were not working, and when he had approached within a half block he observed that the traffic standard on the southeast corner had been taken down, and that all the lights were turned off; that at the time he entered the intersection and until the time of the collision, the Garcia truck was on his left side; that it obstructed his view to his left, and that the first time he saw William Goodman was when he was right there "in the center of my car." At the time his speed was between 25 and 30 miles per hour.

On these facts the jury returned a verdict against the city.

Appellant contends that, as a matter of law, there is no evidence from which the jury could have found any dangerous or defective condition of public property existed at this intersection at the time of the accident, and that the absence of electric traffic signals did not in any way contribute to the occurrence of the accident.

Section 53050, Government Code, defines "public property" as meaning public street, highway, building, park, grounds, works, or property; and "local agency" as including a city. Section 53051 provides:

"A local agency is liable for injuries to persons and prop-

erty resulting from the dangerous or defective condition of public property if the legislative body, board, or person authorized to remedy the condition:

"(a) Had knowledge or notice of the defective condition.

"(b) For a reasonable time after acquiring knowledge or receiving notice, failed to remedy the condition or to take action reasonably necessary to protect the public against the condition."

It is now settled law that automatic traffic signals are included in the term property as used in the statute. (*Hoel* v. *City of Los Angeles,* 136 Cal.App.2d 295 [288 P.2d 989], citing *Bady* v. *Detwiler,* 127 Cal.App.2d 321, 330 [273 P.2d 941].)

It is stated in the Hoel case: "In the first place, the statute is in derogation of the common law rule of no liability for malperformance of a governmental function and is to be strictly construed. [Citing cases.] The statute itself draws a distinction between remedying and affording protection against an existing defect. The knowledge or notice must reach a body, board or person authorized to remedy the condition, and that body or person must within a reasonable time 'remedy the condition or . . . take action reasonably necessary to protect the public against the condition.' In other words, make a permanent correction or supply temporary protection against an uncorrected defect." (Pp. 303-304.)

In the instant case when the traffic lights failed and notice was given, or acquired, actually or constructively of the defective condition of the traffic lights, i.e., that from some cause they were not operating properly and were misdirecting instead of directing traffic, thereby creating a dangerous condition by reason of faulty action, a duty arose to do one of two things within a reasonable time; either to correct the defective condition of the traffic lights or to take action to protect the public against the condition caused by the faulty operation of the lights. This the city did when it turned them off. The dangerous or defective condition so far as the traffic lights were concerned was simply that they confused traffic. This was remedied by turning them off. There is no evidence that there was any other dangerous or defective condition of public property at this intersection. There were no traffic lights at the intersections immediately to the east and to the west. In fact, the evidence shows that for several blocks to the east and to the west of the intersection at East Charter Way and South San Joaquin Street traffic lights were only

installed and operated on East Charter Way at every other cross street. As before noted, East Charter Way was an arterial thoroughfare duly posted with stop signs as required by the Vehicle Code. These stop signs were installed at the intersection in question, and when the traffic lights were turned off due to faulty operation, its condition became comparable, insofar as the regulation of the flow of traffic was concerned, with those intersections without traffic lights.

The Public Liability Act was not enacted for the purpose of protecting those who come upon city streets but only those who sustain injury by reason of a "dangerous or defective condition." (*Shipley* v. *City of Arroyo Grande*, 92 Cal. App.2d 748-750 [208 P.2d 51].) A city is not an insurer of the safety of travelers; it is required only to exercise ordinary care to maintain its streets in a reasonably safe condition for those using them. (*George* v. *City of Los Angeles*, 11 Cal.2d 303, 308 [79 P.2d 723].)

In order to avoid an entrapment situation such as existed in *Bady* v. *Detwiler, supra,* the city authorities in the case before us did the very thing that the court held they should do in the case of *Hoel* v. *City of Los Angeles, supra*; that is, they eliminated the potentially dangerous condition by turning the traffic lights off in order to protect the public against it. No trap such as existed in the case of *Irvin* v. *Padelford,* 127 Cal.App.2d 135 [273 P.2d 539], was actually created by the city of Stockton when it turned off the traffic lights. When the lights were turned off, their defective condition could no longer mislead or misdirect the injured party.

Nor could the city be held liable in failing to direct traffic while the lights were being repaired. Such nonfeasance is within the exercise of a governmental function and could give rise to no muncipal liability because it did not consist of the use of defective property. (*Hoel* v. *City of Los Angeles, supra* at p. 303; *Stang* v. *City of Mill Valley,* 38 Cal.2d 486, 488 [240 P.2d 980] ; *Douglass* v. *City of Los Angeles,* 5 Cal.2d 123, 127-128 [53 P.2d 353] ; *Bauman* v. *City & County of San Francisco,* 42 Cal.App.2d 144, 158 [108 P.2d 989].)

In view of what we have said above, we deem it unnecessary to discuss the second contention of appellant based on lack of proximate cause.

We conclude that there was no evidence of a violation of the Public Liability Act by the city of Stockton.

The judgment is reversed, and the trial court is ordered to enter judgment in favor of the appellant.

Van Dyke, P. J., and Peek, J., concurred.

A petition for a rehearing was denied July 15, 1957, and respondents' petition for a hearing by the Supreme Court was denied August 13, 1957. Gibson, C. J., and Carter, J., were of the opinion that the petition should be granted.