[No. B077294. Second Dist., Div. Two. Sept. 5, 1995.]

HOSNE CHOWDHURY et al., Plaintiffs and Respondents, v.
CITY OF LOS ANGELES, Defendant and Appellant.

## COUNSEL

James K. Hahn, City Attorney, Thomas C. Hokinson, Assistant City Attorney, and Renee J. Laurents, Deputy City Attorney, for Defendant and Appellant.

Greenberg & Panish, David Greenberg and Edward J. Horowitz for Plaintiffs and Respondents.

## OPINION

**BOREN, P. J.**—Mohammed Chowdhury died in an automobile accident when his vehicle was broadsided in an intersection. The driver of the other vehicle failed to stop before proceeding through the intersection even though the traffic signals were inoperative in all directions due to an area-wide electrical power outage. The decedent's wife and daughter sued the City of Los Angeles (the City) for failing to take measures to avert the accident. Following a court trial, the court found that the accident and death were caused by the City's failure to correct a known "dangerous condition" of its property and by creating a "trap" for motorists, and awarded the plaintiffs over a million dollars in damages.

We conclude that (a) an obviously inoperative traffic signal caused by an area-wide electrical power failure is not a dangerous condition of public property as a matter of law because the inoperative signals are automatically converted into stop signs by statute, and (b) the accident was not proximately caused by a "concealed trap" on the City's property. Accordingly, we reverse the judgment and direct the trial court to enter judgment in favor of the City of Los Angeles.

## FACTS

A power outage occurred at approximately 12:56 a.m. on Sunday, April 22, 1990, in the mid-City neighborhood of the City of Los Angeles. The outage covered an area that is about seven city blocks from north to south, and about seven blocks from east to west, and included a number of heavily traveled intersections. It was stipulated that the outage extinguished the traffic signals at 15 intersections.[1]

Soon afterward, the department of water and power (DWP) dispatched crews to repair the problem. The DWP sent the department of transportation (DOT) a facsimile to alert it to the outage. The DOT fax number is in the bureau of traffic control radio control room, which is staffed 24 hours a day. It is not clear whether anyone received the transmittal. The transmittal informed DOT that there was electrical trouble, but did not say whether any traffic signals were affected.

DOT has a manual of policies and procedures. One portion of the manual addresses the topic of traffic signal repair, and establishes procedures for traffic signal repair personnel to follow in providing traffic control during periods when traffic signals are damaged or malfunctioning. The manual notes that "As it is not possible to anticipate all conditions which arise, the specific action to be taken must be left to the discretion and judgment of the person responding to a trouble call or observing signal malfunction. The appropriate action will vary with the degree of damage, type of malfunction, traffic conditions, and other factors."

The manual directs that "Temporary stop signs should be placed facing traffic . . . [w]hen neither normal operation nor emergency flash operation is possible and this condition will extend into the hours of darkness." The repair person is to place signs adjacent to the curb and on the center or barrier line near the normal stopping location. Thus, at an intersection with four inoperative traffic lights, eight signs are required, two per side. In addition, "Traffic Officer assistance should be requested . . . a. During the period necessary to obtain a temporary platform traffic signal or to set pedestal stop signs. b. If there is traffic congestion at the intersection." A 1986 addition to the manual specifies that "The following procedure will be followed when there is a power failure affecting traffic signals: A. Place stop signs as required . . . B. Set intersection controller to 'Flash' operation . . . C. Upon restoration of power, remove stop signs, return the intersection

---

[1]Among them, Western Avenue/Washington Boulevard, Western/Venice Boulevard, Western/Pico Boulevard, Arlington Avenue/Pico, Arlington/Venice, Arlington/Washington, Wilton Place/Pico, Wilton/Venice, and Wilton/Washington.

controller to normal operation, conduct a thorough inspection of the intersection . . . ."

DOT had two traffic signal repairmen working the Sunday graveyard shift at the time of the power outage. One covered the San Fernando Valley and the other covered the rest of Los Angeles. Among the equipment carried by the repairmen are pedestal stop signs for use where traffic signals are inoperative for one reason or another. DOT's policy for pedestal stop signs does not encompass situations where there is an area-wide (i.e., covering more than three or four intersections) power outage. A widespread power failure might disable multiple signals at a multitude of intersections, and there simply is not enough manpower to respond to such a situation. A traffic signal repairman has discretion to do nothing at all in a situation where 15 signals are inoperative because the repair trucks are not capable of carrying enough stop signs to cover that many intersections. The repair trucks only carry enough stop signs for one intersection.

As noted in the DOT manual, if all the lights are out at a major intersection, DOT repairmen "should" (not "must" or "shall") ask for assistance from traffic control officers. A traffic control officer testified that if a call came in for assistance in this situation, where the signals were inoperative, an officer might go to the location, then do nothing and leave if traffic was sparse.

The repairman who received word of a problem with the signals in the affected area at 2:18 a.m. claimed he was not aware the problem was a power outage; however, his log sheet shows he marked down that it was an "all out" situation and he later told a police officer he was aware there was a blackout. He did not request assistance from traffic control officers.[2]

The repairman did not arrive in the area until 3:42 a.m., but the first signal he encountered at Pico and Arlington was working, with the exception of one lamp, which he replaced. Moving down Arlington, he saw that there was a blackout. He positioned all the pedestal stop signs in his truck, of which there were eight, at the intersection of Arlington and Washington in the manner specified in the DOT manual. It was now a little after 4 a.m. He failed to see how many intersections were affected by the outage or to notify his dispatcher, as required. He drove to a city yard 12 minutes away, picked up 8 more pedestal stop signs, then drove to the intersection of Western and the Santa Monica Freeway, where he observed upon his arrival at 4:54 a.m.

---

[2]A DOT employee in charge of traffic enforcement testified that there were two traffic control officers covering the southern, central and Wilshire districts in the early morning hours on the day of the accident.

that the signals were all out. He noticed that an accident had occurred at the nearby intersection of Western and Washington, where emergency vehicles were on the scene. He placed three stop signs at that intersection, which was partly blocked by the accident.

Respondents' decedent, Mohammed Chowdhury, a gas station employee, arrived at the intersection of Western and Washington about 4:40 a.m. Witnesses saw him stop before continuing south on Western. A church van driven by Eung Ki Lim, traveling east on Washington at an excessive rate of speed, failed to stop at the intersection and broadsided the decedent's vehicle. Lim's speed was variously estimated to be from 41 to 62 miles per hour when he perceived the other vehicle, and 36 to 58 miles per hour at the time of impact. Lim was adamant that he had a green light, but other testimony established that the signals were inoperative.[3] Lim acknowledged that the traffic and overhead lights on Washington were out east of Arlington and recalled that he saw the pedestal stop signs the traffic signal repairman had placed at the intersection of Arlington and Washington. He stopped where the signs were. He would have stopped at Western, as well, if a stop sign had been placed there. Chowdhury died of his injuries an hour after the accident.

Respondents' traffic expert opined that DOT employees failed to follow city procedures by not manning the facsimile machines at all times, by not checking all local intersections to see which were affected, and by not notifying traffic control officers. He felt the intersection was a dangerous condition because it was not controlled to define clearly the right-of-way for motorists, and that the accident would not have occurred if all the necessary procedures were followed. The expert testified that Lim was "trapped" into believing he had the right-of-way after seeing the pedestal stop signs at Arlington and Washington, then not seeing similar signs directing him to stop at Western and Washington. He surmised that Lim "felt he had the right of way" on account of the stop signs he had previously seen. A DOT supervisor opined that a blackout did not create a dangerous condition at intersections because it was obvious to motorists that all the power was out in the area, including the traffic signals.

The trial court found that DOT had a duty to place stop signs during a power outage or to call for traffic control officers if signs could not be placed. The repairman in this instance failed to seek assistance from traffic

---

[3]When asked whether the signal at Washington and Western was operative, Lim replied, ". . . I don't know about the right side, but the one on the—hanging overhead had a green light and I saw that light." When asked if he might not be mistaken, Lim replied that he was sure the light was green.

control officers or the police department despite the outage. Nearly four hours after DOT learned of the outage, Chowdhury was broadsided by Lim. The accident was the result of a "dangerous condition," namely that the traffic signals were not operating at the time of the accident. DOT failed to take appropriate measures to protect the public after learning of the dangerous condition, the court found. By placing signs at only one intersection, the court stated, DOT created a "trap" for motorists. The court awarded damages of $1,185,000.

DISCUSSION

1. *Existence of a Dangerous Condition*

■ The issue presented here is whether a significant, obvious and complete power outage which causes all the traffic signals to fail amounts to a dangerous condition of public property. We conclude that obviously inoperative traffic signals during a power outage do not amount to a dangerous condition as a matter of law.

"[A] public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, [and] that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred . . . ." The plaintiff must also show that a negligent or wrongful act or omission of a public employee created the dangerous condition, *or* the public entity had actual or constructive notice of the dangerous condition a sufficient time prior to the injury to have taken measures to protect against it. (Gov. Code, § 835.)[4]

A "dangerous condition" is defined as "a condition of property that creates a substantial . . . risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used." (§ 830.) ■ The existence of a dangerous condition is usually a question of fact, but may be resolved as a question of law if reasonable minds can come to but one conclusion. (§ 830.2; *Peterson* v. *San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 810 [205 Cal.Rptr. 842, 685 P.2d 1193]; *Mittenhuber* v. *City of Redondo Beach* (1983) 142 Cal.App.3d 1, 5 [190 Cal.Rptr. 694].)[5]

■ A public entity does not create a dangerous condition on its property "merely because of the failure to provide regulatory traffic control signals,

---

[4] All future statutory references are to the Government Code, unless otherwise indicated.

[5] Section 830.2 provides, "A condition is not a dangerous condition within the meaning of this chapter if the trial or appellate court, viewing the evidence most favorably to the plaintiff,

stop signs, yield right-of-way signs, or speed restriction signs . . . ." (§ 830.4.) If, on the other hand, the government installs traffic signals and invites the public to justifiably rely on them, liability will attach if the signals malfunction, confusing or misleading motorists, and causing an accident to occur. The reasoning behind this rule is that the government creates a dangerous condition and a trap when it operates traffic signals that, for example, direct motorists to "go" in all four directions of an intersection simultaneously, with predictable results. (*Bady* v. *Detwiler* (1954) 127 Cal.App.2d 321, 325 [273 P.2d 941]; *Hoel* v. *City of Los Angeles* (1955) 136 Cal.App.2d 295, 299 [288 P.2d 989]; *Goodman* v. *Raposa* (1957) 151 Cal.App.2d 830, 832, 834-835 [312 P.2d 65]. See also *Mathews* v. *State of California* ex rel. *Dept. of Transportation* (1978) 82 Cal.App.3d 116 [145 Cal.Rptr. 443] [malfunctioning traffic lights stuck on green and red].)

▮ If the government turns off traffic signals entirely to avoid confusion, liability does not attach. "When the [traffic] lights were turned off, their defective condition could no longer mislead or misdirect the injured party." (*Goodman* v. *Raposa, supra,* 151 Cal.App.2d at p. 835; *Hoel* v. *City of Los Angeles, supra,* 136 Cal.App.2d at p. 306.) The same result obtains whether the traffic signals are extinguished by design or by accident.

The City elected to install traffic signals at the intersection in question here. However, when the signals were extinguished during the power outage, the City did not invite the public to rely on the signals as a means of controlling the right-of-way at the intersection. The signals did not give a false indication to "go." Rather, they gave no indication at all, and did not mislead or misdirect motorists.

Under the circumstances, motorists approaching the intersection were bound not by the City's inoperative light, but by the provisions of the Vehicle Code, which effectively transform an inoperative signal light into a stop sign. (Veh. Code, § 21800.)[6] Once the signals failed, the City could reasonably foresee that motorists using due care would obey the provisions of the Vehicle Code and make a full stop before proceeding when it was safe to do so. The City cannot be charged with foreseeing that a motorist will recklessly disobey traffic laws and speed through an intersection without

---

determines as a matter of law that the risk created by the condition was of such a minor, trivial or insignificant nature in view of the surrounding circumstances that no reasonable person would conclude that the condition created a substantial risk of injury when such property or adjacent property was used with due care in a manner in which it was reasonably foreseeable that it would be used."

[6]Vehicle Code section 21800, subdivision (d)(1) states, "The driver of any vehicle approaching an intersection which has official traffic control signals that are inoperative shall stop at the intersection, and may proceed with caution when it is safe to do so."

heed to its inoperative traffic lights any more than it can be charged with foreseeing that irresponsible drivers will race at 100 miles per hour down a highway or drive the wrong way down a one-way street, in violation of the traffic laws.

The duty contemplated by the trial court in this case creates an impossible situation for the public entity. One need only imagine a lengthy county-wide power outage caused by an earthquake or terrorist sabotage, for example, to realize that the government cannot conceivably provide the type of public protection the trial court sought to impose.[7] At some point, citizens must take responsibility for their conduct when there is an obvious roadway hazard such as a widespread power outage in an urban area. The government cannot provide round-the-clock staffing to respond to every eventuality, particularly when the need to take precautions is self-evident and the law is clear on how motorists must behave under the circumstances.[8] This is undoubtedly why the DOT manual leaves the determination of how to respond to the discretion and judgment of its repair personnel, and does not make any particular action mandatory.

As one court has observed, any property can be dangerous if used in a sufficiently improper manner. For this reason, a public entity is only required to provide roads that are safe for reasonably foreseeable careful use. (*Fuller* v. *State of California* (1975) 51 Cal.App.3d 926, 940 [125 Cal.Rptr. 586].) "If [ ] it can be shown that the property is safe when used with due care and that a risk of harm is created only when foreseeable users fail to exercise due care, then such property is not 'dangerous' within the meaning of section 830, subdivision (a)." (*Swaner* v. *City of Santa Monica* (1984) 150 Cal.App.3d 789, 799 [198 Cal.Rptr. 208].) The extinguished traffic lights created a four-way stop at the intersection of Washington and Western. A four-way stop is not an inherently dangerous condition when used with due care by the general public. The only risk of harm was from a motorist who failed to exercise due care by obeying the de facto stop signs. The City is not liable for that conduct.

## 2. *Existence of a Concealed Trap*

■ A public entity may be liable for accidents proximately caused by its failure to provide a signal, sign, marking or device to warn of a dangerous

---

[7]Interestingly, the trial court initially opined that inoperative traffic signals are not, per se, a dangerous condition. However, the court stated that the intersection became dangerous after the City failed to post stop signs though several hours had passed. Either the intersection was dangerous from the outset or it was not. It did not *become* any more or less dangerous to motorists with the passage of time. It was dark for the duration of the outage.

[8]The government also cannot be held liable for failing to direct traffic while traffic lights are being repaired. (*Hoel* v. *City of Los Angeles, supra*, 136 Cal.App.2d at p. 303; *Goodman* v. *Raposa, supra*, 151 Cal.App.2d at p. 835.)

condition which endangers the safe movement of traffic "and which would not be reasonably apparent to, and would not have been anticipated by, a person exercising due care." (§ 830.8.) This "concealed trap" statute applies to accidents proximately caused when, for example, the public entity fails to post signs warning of a sharp or poorly banked curve ahead on its road or of a hidden intersection behind a promontory (*Cameron* v. *State of California* (1972) 7 Cal.3d 318, 323, 327 [102 Cal.Rptr. 305, 497 P.2d 777]; *Johnston* v. *County of Yolo* (1969) 274 Cal.App.2d 46, 59-61 [79 Cal.Rptr. 33]; *Feingold* v. *County of Los Angeles* (1967) 254 Cal.App.2d 622, 625-626 [62 Cal.Rptr. 396]), or where a design defect in the roadway causes moisture to freeze and create an icy road surface, a fact known to the public entity but not to unsuspecting motorists (*Flournoy* v. *State of California* (1969) 275 Cal.App.2d 806, 808-810 [80 Cal.Rptr. 485]), or where road work is being performed on a highway (*Kessler* v. *State of California* (1988) 206 Cal.App.3d 317, 321 [253 Cal.Rptr. 537]).

■ Respondents and the trial court theorized that a motorist who stopped at one pedestal-stop-sign-posted intersection might be "trapped" into believing he need not stop at later, unposted intersections where signals are inoperative due to a power outage. Indeed, respondents' expert speculated that the motorist who did not stop in this case, Mr. Lim, "felt he had the right of way" at the intersection of Washington and Western because this intersection lacked the temporary stop signs he had previously encountered at Washington and Arlington.

There is no evidence to support the claim that posting stop signs at a distant intersection was a substantial factor in causing this accident. (*Mitchell* v. *Gonzales* (1991) 54 Cal.3d 1041, 1052 [1 Cal.Rptr.2d 913, 819 P.2d 872].) Lim did not testify that his failure to stop at the intersection of Washington and Arlington was caused by some confusion created by the pedestal stop signs he had previously encountered. Lim unequivocally testified that he did not stop because he had a green light. From this, a fact finder could infer that Lim (1) suffered a visual misperception, or (2) was lying to justify his failure to stop at the nonfunctioning light. It cannot be inferred from the testimony that Lim was confused by the pedestal stop signs. The testimony of respondents' expert that Lim "felt he had the right of way" due to the pedestal stop signs is pure conjecture and surmise, attributing thoughts to Lim that Lim denied having, and does not amount to sufficient evidence that a trap created by the pedestal stop signs was a substantial factor in causing this accident. Accordingly, the trial court's finding of liability based on a concealed trap cannot be sustained.

## DISPOSITION

The judgment is reversed. Costs, if any, to the prevailing party.

Fukuto, J., and Nott, J., concurred.

A petition for a rehearing was denied September 28, 1995, and respondents' petition for review by the Supreme Court was denied November 15, 1995.