107 Cal.Rptr.2d 916 (2001)
89 Cal.App.4th 1398
Darlene BONANNO, an Incompetent Person, etc. Plaintiff and Respondent,
v.
CENTRAL CONTRA COSTA TRANSIT AUTHORITY, Defendant and Appellant;
Diana Bonta', as Director, etc. Claimant and Respondent. Darlene Bonanno, an Incompetent Person, etc. Plaintiff and Appellant,
v.
Central Contra Costa Transit Authority, Defendant and Respondent;
Diana Bonta', as Director, etc. Claimant and Respondent.
Nos. A087846, A088589.
Court of Appeal, First District, Division Four.
June 18, 2001.
Review Granted September 19, 2001.
*919 Low, Ball & Lynch, David B. Lynch, Dale L. Allen, Jr., Jennifer C. Rasmussen, Christopher E. Arras, San Francisco, for Appellant (A087846), and Respondent (A088589), Central Contra Costa Transit, Authority (CCCTA).
Rankin, Landsness, Lahde, Serverian & Stock, Michael C. Serverian, San Jose, Alan S. Liang, for Amicus Curiae, California Transit Insurance Pool on behalf of Appellant CCCTA.
Hanson, Bridgett, Marcus, Vlahos & Rudy, LLP, David W. Baer, San Francisco, Kurt A. Franklin, for Amicus Curiae, San Mateo County Transit District on behalf of Appellant CCCTA (A087846).
Law Offices of Walker & Hamilton Walter H. Walker, III, San Francisco, Dane J. Durham, Timothy M. Hamilton, Mill Valley, for Appellant (A088589) and Respondent (A087846) Darlene Bonanno, an Incompetent Person, etc.
Bill Lockyer, Attorney General, Stephanie Wald, Deputy Attorney General, Angela Botelho, Deputy Attorney General, State of California, for Claimant and Respondent, (A087846/A088589).
Certified for Partial Publication.[*]
REARDON, Acting P.J.
In November 1993 Darlene Bonanno (Bonanno) sustained serious injuries when struck by a motor vehicle as she crossed Pacheco Boulevard in Martinez. This is the third appellate chapter in litigation that commenced seven years ago. It is the second time that we have been called upon to address issues concerning whether maintenance of a bus stop at a particular location constituted a dangerous condition of public property, and whether Central Contra Costa Transit Authority (CCCTA) bore any liability as a result.
We conclude that the jury verdict in favor of Bonanno is valid and will stand. We further conclude that posttrial orders taxing costs and reducing the judgment for collateral source payments will stand.

I. FACTUAL BACKGROUND

A. Historical Conditions
Prior to 1982 the AC Transit District operated the bus routes in central Contra Costa County (County). CCCTA assumed those services in 1982. At that time there was a bus stop located at DeNormandie Way and Pacheco Boulevard, on the north side of Pacheco. In the early 1980's residents in the neighborhood of that intersection made it known to County officials that they were having difficulty crossing Pacheco to get to the bus stop. Thereafter the County installed a crosswalk at the intersection.
However, the crosswalk did not solve the difficulty pedestrians faced in finding adequate gaps in traffic during the morning commute. Morning commute traffic on Pacheco was heavy and traffic in general increased 4 to 5 percent per year on major county arterials. Drivers were relatively inattentive and the speed limit was generally disregarded. Rear-end and fenderbender accidents occurred at DeNormandie and other intersections along Pacheco.
The DeNormandie crosswalk was not frequently used. The drivers of the two cars involved in the Bonanno accident regularly commuted on Pacheco but were unfamiliar with the crosswalk as well as the connecting bus stop. CCCTA's own representative did not remember seeing the bus stop when he drove up and down Pacheco.

B. Chittock Accident
Kimberly Chittock lived on 7 Robinsdale Road in Martinez. Around 7:30 a.m. on February 25, 1986, she was on her way to catch the bus to school. There was a *920 tremendous flow of traffic. In the past she had tried to cross Pacheco in the crosswalk but none of the cars would stop. That morning she was struck by a car while jogging across Pacheco mid-block to get to the DeNormandie bus stop.
The Chittock family filed a claim against CCCTA complaining about the location of the DeNormandie bus stop. CCCTA denied the claim.

C. Student Complaints; Stoplight at Morello Avenue
Morello Avenue was one block west of DeNormandie. The year after Chittock's accident, during the first quarter of 1987, 15 students complained to CCCTA that it was too dangerous to cross at Morello Avenue and Pacheco to get to the DeNormandie bus stop.
Meanwhile, the County installed four traffic signal lights at Morello and Pacheco, as well as north-south crosswalks across Pacheco. The stoplights, equipped with pedestrian push buttons, were activated in July 1987. After the lights were installed, CCCTA did not move its bus stop from DeNormandie to Morello.
Although pedestrians could now cross Pacheco safely, the route to the bus stop along the north shoulder of Pacheco was unnecessarily hazardous. The shoulder was relatively narrow, with gravel and dirt adjacent to the paved portion which could be muddy. Additionally, the area was frequently occupied by large parked trucks and there was one portion where the drainage swale had eroded to within five and a half feet of the edge line. At one point the north shoulder dropped off into a ravine, requiring pedestrians to walk outside the fog line.
Traffic engineer Dr. Thomas Schultz was deposed in the Chittock case in 1991. Questioned about his deposition in the current trial, he indicated it was his opinion that pedestrians trying to cross Pacheco during the morning commute to get to the DeNormandie bus stop could not find safe gaps in traffic without a signal. Further, as a matter of bus patron safety, the DeNormandie bus stop should be moved to Morello.
The bus stop was not moved.

D. Bonanno's Accident
Bonanno lives with members of her family on Robinsdale Road, next door to Kimberly Chittock. She is a mildly retarded woman who, at the time of the accident, used public transportation, including CCCTA, to "get around."
On November 16, 1993, around 7:15 a.m., Bonanno left Robinsdale Road and proceeded to Pacheco at the DeNormandie intersection. It was rush hour; cars were passing every two to three seconds and it would have taken her at least 12 to 13 seconds to cross on foot. She waited on the curb for several minutes for a break in traffic so she could get to the bus stop.
An eastbound vehicle came along driven by Jennifer Kimberly. She saw Bonanno standing on the curb, and stopped to let her cross. Kimberly waited, then waved for Bonanno to move. Bonanno kept checking the traffic; Kimberly waved to her again.
At the same time Paul Christie was driving westbound on Pacheco. He had seen and been involved in some "close calls" in the area. Christie spotted Bonanno waiting to cross and stopped to block traffic for her. A truck went around him on the shoulder to the right.
Meanwhile, Jeremy McLain was proceeding eastbound on Pacheco on his way to work. He was having difficulty seeing out of the windshield because of the foggy *921 condition; he bent down to peer out the lower section.
Bonanno had stepped out into the intersection. As she walked in front of Kimberly's car, along came McLain and rearended into Kimberly's car, causing it to thrust forward and hit Bonanno. She flew up in the air and fell straight back down.
Bonanno initially lapsed into a coma. She eventually underwent surgery to straighten out her foot.

E. Procedural History
Bonanno filed a complaint in 1994, by and through her guardian ad litem. Among others she sued CCCTA, the County, McLain and Kaiser Foundation Hospitals and related entities (collectively Kaiser). Kaiser Hospital had treated Bonanno after the accident. The non-Kaiser parties cross-complained against Kaiser. Litigation ensued as to whether cross-complainants were required to arbitrate their cross-claims under the arbitration agreement between Bonanno and Kaiser. We concluded that they did not. (County of Contra Costa v. Kaiser Foundation Health Plan, Inc. (1996) 47 Cal.App.4th 237, 239-240, 54 Cal.Rptr.2d 628.)
Thereafter the trial proceeded. This time CCCTA moved successfully for nonsuit at the conclusion of Bonanno's opening statement, We reversed the judgment of nonsuit in an unpublished opinion. (Bonanno v. Central Contra Costa Transit Authority (Apr. 7, 1998, A078592).) The other defendants settled and in 1999 Bonanno tried her case against CCCTA alone. The jury returned its verdict in her favor, finding McLain 88 percent liable and CCCTA 1 percent liable, with the remaining liability assigned 1 percent to the County and 10 percent to Kaiser Hospital.
CCCTA moved for a new trial and for judgment notwithstanding the verdict; both motions failed. CCCTA appealed from the judgment (No. A087846) and Bonanno appealed from posttrial orders concerning costs and damages (No. A088589). We have consolidated the appeals for all purposes.

II. DISCUSSION

A. Liability for Dangerous Condition of Public Property

1. General Principles
Bonanno's theory of liability against CCCTA was that placement and maintenance of the bus stop near the DeNormandie Pacheco intersection was a "dangerous condition" within the meaning of Government Code[1] section 830 that operated as a concurring cause of her injury.
As a general matter, a public entity such as CCCTA is "liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and [that]: [¶] ... [¶] (b) [t]he public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition." (§ 835.)
Thus, to establish liability under section 835 plaintiff must prove: (1) the public property was in a dangerous condition when the injury occurred; (2) the dangerous condition proximately caused the injury; (3) the injury was reasonably foreseeable as a consequence of the condition; and (4) the public entity had constructive notice of the dangerous condition *922 in sufficient time to have reasonably taken steps to protect against it.
A "dangerous condition" is "a condition of property that creates a substantial ... risk of injury when such property or adjacent property is used with due care" in a "reasonably foreseeable" manner. (§ 830, subd. (a).) "Adjacent property" refers to the area "exposed to the risk created by a dangerous condition of the public property. For example, the hazard created by a condition of public property may not be a hazard to persons using the public property itself, but may be a hazard ... to those using other property.... [¶] ... A public entity may be liable only for dangerous conditions of its own property. But its own property may be considered dangerous if it creates a substantial risk of injury to . . . persons on adjacent property; and its own property may be considered dangerous if a condition on the adjacent property exposes those using the public property to a substantial risk of injury." (Cal. Law Revision Com. com., 32 West's Ann. Gov.Code (1995 ed.) foil. § 830, p. 299.)
Finally, a dangerous condition may exist by virtue of the location of the public improvement. (See Warden v. City of Los Angeles (1975) 13 Cal.3d 297, 300, 118 Cal. Rptr. 487, 530 P.2d 175 [submerged pipe near surface in recreational waters is a dangerous condition]; Van Alstyne et al., 2 Cal. Government Tort Liability Practice (Cont.Ed.Bar 4th ed.1999 & 2001 supp.) § 12.18(2), pp. 769-770 (Van Alstyne).)

2. Maintenance of the Bus Stop at the DeNormandie Location Constituted a Dangerous Condition
Here, Bonanno went to the DeNormandie Pacheco intersection during the morning rush hour and proceeded into the unprotected crosswalk because of the location of the CCCTA bus stop. She had no other purpose to be there other than to reach the bus stop.
During the morning commute, traffic was heavy and fast and drivers were inattentive. Pedestrians had difficulty finding gaps in traffic to cross at the DeNormandie Pacheco intersection; the wait was 5 to 10 minutes. As a general matter under these conditions pedestrians start out looking for a long gap, but will eventually accept a shorter gap, then probably approach from the curb to indicate they want to cross. Bonanno herself waited on the curb for a gap in traffic; motorists Kimberly (eastbound) and Christie (westbound) stopped to facilitate her crossing, but the gap was still insufficient. The drivers behind them did not anticipate stopping at DeNormandie and either drove into or around the stopped vehicles.
The DeNormandie crosswalk was located just a block away from the Morello intersection, which itself was equipped with traffic lights and pedestrian-activated crossing signals. Several regular commuters proceeding eastbound on Pacheco from Morello to DeNormandie, including the drivers involved in the accident, testified that they were unaware of the DeNormandie crosswalk and/or the bus stop. McLain testified he did not anticipate stopping there so soon after the Morello intersection.
The continued maintenance of this particular bus stop at this particular location constituted a dangerous condition in light of all the above circumstances for the very reason that it beckoned pedestrian bus patrons to cross, and compelled cars to stop, at the feeder crosswalk without attendant traffic lights or pedestrian-activated signals.

3. CCCTA's Counterarguments are Unavailing
CCCTA floats a slew of arguments to pick away at Bonanno's dangerous condition theory of liability. None have merit.

*923 a. This Case Is Not About a Sign

First, CCCTA casts the theory as asserting that the dangerous condition was the CCCTA sign and pole, neither of which was defective. This is not a case about a sign. The theory of liability is that the maintenance of the bus stop at that location created a hazard with respect to pedestrian bus patrons using the adjacent crosswalk in a reasonably foreseeable manner and with due care. While a public entity is not liable for dangerous conditions on adjacent property, by definition its own property may be dangerous if it creates a substantial risk of injury as to persons using adjacent property. (§ 830, subd. (a); Cal. Law Revision Com. com, 32 West's Ann. Gov.Code, supra, foil. § 830, p. 299.)
Similarly, CCCTA contends that since it did not own or control the sidewalk, the street, the crosswalk or the shoulder where the sign was located, it cannot be held responsible for a dangerous condition of property. Again, the location of the bus stop was within CCCTA's control, and it was this location which increased the risk of injury when pedestrian-patrons proceeded with due care through adjacent property towards the bus stop. Holmes v. City of Oakland (1968) 260 Cal.App.2d 378, 67 Cal.Rptr. 197 supports this point. There a six-year-old child was on his way home from school when a train struck him, severing both legs. The reviewing court held that the plaintiff could pursue the city on a dangerous condition theory even though the city did not own or control the railroad right of way. It reasoned that the portion of the city street running along the right of way was dangerous because a condition on the adjacent right of way exposed those using the public street to a substantial risk of injury. (Id. at pp. 389-392, 67 Cal.Rptr. 197.)

b. McLain's Tortious Behavior Does Not Negate CCCTA's Liability
CCCTA also asserts that it cannot be liable unless those who foreseeably use the property or adjacent property do so with due care. McLain was negligent and thus CCCTA cannot be responsible for failing to take precautions to protect against him, so the argument goes. Again, this was not Bonanno's theory. The actor in this section 835 scenario is Bonanno, who was using the adjacent property with due care. Her theory was that the ongoing maintenance of the bus stop allowed the accident to happen.
Nonetheless CCCTA persists that a motorist's failure to use due care negates any liability for a dangerous condition of adjacent property, citing Lompoc Unified School Dist. v. Superior Court (1993) 20 Cal.App.4th 1688, 1697, 26 Cal.Rptr.2d 122. There plaintiff was injured by a motorist who had been distracted by public property, namely a football field [with game in progress] which used to be shielded by a hedge doubling as a distraction barrier. Plaintiff argued that by trimming the hedge the school district created a dangerous condition. (Id. at p. 1696, 26 Cal. Rptr.2d 122.) This is not a case where a negligent motorist was distracted by public property. Rather, this case is about the location of a public bus stop which beckoned a prudent pedestrian to cross a busy street in an unprotected crosswalk and under conditions that posed a substantial risk of harm to pedestrian patrons.
Similarly, relying on Chowdhury v. City of Los Angeles (1995) 38 Cal.App.4th 1187, 45 Cal.Rptr.2d 657, CCCTA urges that it cannot be charged with foreseeing McLain's reckless behavior, and therefore it was entitled to judgment as a matter of law. In Chowdhury, traffic signals were inoperative in all directions due to a power outage and pedestal stop signs had not yet *924 been erected at the intersection in question. A man was killed when another driver failed to stop before proceeding through the intersection. The reviewing court held as a matter of law that an obviously inoperative traffic signal during a power outage does not amount to a dangerous condition. (Id. at p. 1194, 45 Cal.Rptr.2d 657.) Moreover, once the signals failed, the city could reasonably foresee that drivers using due care would obey the Vehicle Code, which effectively transforms an inoperative signal light into a stop sign. On the other hand, the city could not be charged with foreseeing that a motorist would recklessly disobey traffic laws and speed through the intersection. (Id. at pp. 1195-1196, 45 Cal. Rptr.2d 657.)
Unlike Chowdhury, here we have a dangerous condition. And to the extent, if any, that Chowdhury can be read to suggest that a third party's tortious conduct negates the existence of a dangerous condition, it is wrong. (See, e.g., Peterson v. San Francisco Community College Dist. (1984) 36 Cal.3d 799, 812, 205 Cal.Rptr. 842, 685 P.2d 1193; Mathews v. State of California ex rel. Dept. of Transportation (1978) 82 Cal.App.3d 116, 121, 145 Cal. Rptr. 443.) A public entity may be liable for injuries caused by a combination of the dangerous condition of its property and the wrongful acts of third parties. (Slapin v. Los Angeles International Airport (1976) 65 Cal.App.3d 484, 490, 135 Cal. Rptr. 296; see part II.A.4, post.)

c. The Risk of Danger Need Not Be to All Users
Next, CCCTA maintains that the dangerous condition must increase the risk of injury to pedestrians in general, not just prospective bus patrons. CCCTA is correct that liability cannot be premised on the individual characteristics of plaintiff. (Schonfeldt v. State of California (1998) 61 Cal.App.4th 1462, 1466, 72 Cal.Rptr.2d 464 [whether a condition creates a substantial risk of harm depends on how the general public, exercising due care, would use the property. Plaintiffs particular characteristic (there, teenager with attention deficit hyperactivity disorder) does not alter the objective standard].) However, the operative characteristic herepedestrian bus patronis not an individual characteristic. Pedestrian bus patrons are a subset of the general public using the crosswalk in question. There is no legal requirement that the dangerous condition must create a risk to all users of adjacent property.

d. CCCTA Has Control of the Location and Could Remedy the Condition
CCCTA also argues that it did not have authority to remedy the dangerous conditions pedestrians faced in crossing Pacheco Boulevard. To reiterate, the premise here is that CCCTA had control over the location of the bus stop, which it maintained with constructive knowledge of its dangerous condition. The requisite control exists when the public entity has the power to prevent, remedy or guard against the dangerous condition. (Low v. City of Sacramento (1970) 7 Cal.App.3d 826, 834, 87 Cal.Rptr. 173.) CCCTA and the County had joint control over the location and removal of bus stops. That power and control is joint rather than unique does not annihilate a public entity's responsibility for dangerous conditions. (See ibid.)
In a similar vein CCCTA also proposes that it has no liability because private property owners are not liable for injuries occurring on adjacent public property over which they have no ownership or control, where the only "danger" is their property's proximity to the public property. For example, CCCTA refers us to Seaber v. Hotel Del Coronado (1991) 1 Cal.App.4th 481, *925 2 Cal.Rptr.2d 405, a wrongful death action against a hotel arising out of the death of a pedestrian who was struck in a marked crosswalk adjacent to the hotel's property while proceeding from the hotel to his car. The reviewing court held that the hotel, lacking effective control over the sidewalk, could not be shackled with the duty to warn pedestrians of the dangerous risk posed by the crosswalk. (Id. at p. 492, 2 Cal.Rptr.2d 405.)
Interestingly, in reaching this conclusion the Seaber court considered, but distinguished, the "elastic concept" of liability of mobile street vendors for injuries to patrons on adjacent streets. (Seaber v. Hotel Del Coronado, supra, 1 Cal.App.4th at p. 489, 2 Cal.Rptr.2d 405.) That concept of liability has been applied to the operation of a traveling convenience business which encourages patrons to use public streets and sidewalks in predictable approach routes as a means of access. (Schwartz v. Helms Bakery Limited (1967) 67 Cal.2d 232, 60 Cal.Rptr. 510, 430 P.2d 68.) "`"While the street vendor cannot control traffic on the street around him he can, to a degree, control his own movements, the places where he will do business and, thus, the avenues of approach to it."` [Citations.]" (Seaber; supra, at p. 490, 2 Cal. Rptr.2d 405.) Similarly, the existence of the bus stop and sign attracted patrons, beckoning them to cross, thereby requiring commute traffic to stop sometimes unexpectedly during peak activity at an unprotected intersection one block away from a signalized intersection. And, while CCCTA could not control traffic, it did control the location of the bus stop and thus the danger was not simply proximity. The solution was to move or eliminate the bus stop, a remedy that imposed no undue burden on CCCTA.

4. Causation
CCCTA contends that McLain's conduct in driving with the windshield frosted over and with knowledge that there was insufficient forward vision amounted to willful misconduct that "should be deemed legally unforeseeable and a superceding cause of the accident as a matter of law." First, CCCTA offered no jury instructions on this concept. On the other hand, the court did instruct the jury on the doctrine of concurring causes.[2] This doctrine starts from the premise that there may be multiple causes of plaintiffs injury. Where a defendant's negligence is a concurring cause, the law regards it as a legal cause regardless of the extent to which it contributes to that injury. (Espinosa v. Little Co. of Mary Hospital (1995) 31 Cal.App.4th 1304, 1317-1318, 37 Cal. Rptr.2d 541.) The jury was also properly instructed that "[a] cause of injury, damage, loss or harm is something that is a substantial factor in bringing about an injury, damage, loss or harm." (BAJI No. 3.76.)
Second, driving with a fogged windshield is not extraordinary or unforeseeable. Deputy Sheriff Landis, who worked a traffic assignment on Pacheco from 1985 to 1998 about a quarter of a mile east of Morello, testified to traffic conditions in that area, including "people driving with the windows so fogged up they had virtualty *926 no visibility." As well, it is difficult to pin willfulness on McLain when it was established that he was driving below the speed limit.
CCCTA also argues that there is no substantial evidence of causation. We disagree. A defendant's conduct may be a substantial factor in bringing about an injury if it "`has created a force or series of forces which are in continuous and active operation up to the time of the harm.'" (Osborn v. Irwin Memorial Blood Bank (1992) 5 Cal.App.4th 234, 253, 7 Cal.Rptr.2d 101, quoting Rest.2d Torts, § 433, subd. (b).) Here the theory is that the placement and maintenance of the bus stop near the DeNormandie intersection operated as a concurring cause of Bonanno's injury. This state of affairs operated at the moment of injury and concurred with McLain's negligence to produce Bonanno's injury. As a matter of ordinary experience, maintenance of this dangerous condition might be expected to create the very risk of accident that occurred. It compelled Bonanno, as a bus patron, to cross a busy street in an unprotected sidewalk instead of using a protected crosswalk a block away. This situation in turn prompted Kimberly to stop in the middle of a busy thoroughfare to facilitate Bonanno's crossing. As a final link, McLain ran into a car that would in all likelihood otherwise not be stopped were it not for the maintenance of the dangerous condition of this particular bus stop. From McLain's and others' perspectives, the location of the unlighted crosswalk just a block down from a four-way stoplight with pedestrian-activated signals was unexpected.
5.-6[**]
B.-C.[**]

III. DISPOSITION
We affirm the judgment and the postjudgment orders in their entirety.
SEPULVEDA, J., and CHIANTELLI, J.[***], concur.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II.A.5, II.A.6, II.B and II.C.
[1] Unless otherwise indicated, all statutory references are to the Government Code.
[2] The court delivered BAJI No. 3.77 as follows: "There may be more than one cause of an injury. When negligent or wrongful conduct of two or more persons contribute concurrently as causes of an injury, the conduct of each is a cause of the injury regardless of the extent to which each contributes to the injury. A cause is concurrent if it was operative at the moment of injury and acted with another cause to produce the injury. It is no defense that the negligent conduct of a person not joined as a party was also a cause of the injury."
[**] See footnote *, ante.
[***] Judge of the San Franciso Superior Court assigned by the Chief Jusitce pursuant to article IV, section 6 of the California Constitution.